**In re ADLER, COLEMAN CLEARING CORP., Debtors.**

**Edwin B. Mishkin, as SIPA Trustee for the Liquidation of the Business of Adler Coleman Clearing Corp., Plaintiff,**

v.

**Anthony Siclari, Defendant.**

**Bankruptcy No. 95–8203(REG).**

**Adversary No. 98–9432(REG).**

United States Bankruptcy Court, S.D. New York.

March 27, 2002.

Cleary, Gottlieb, Steen & Hamilton, New York City, by Mitchell A. Lowenthal, Fia F. Porter, for SIPA Trustee.

Securities Investor Protection Corporation, Washington, D.C., by Kenneth J. Caputo.

Paul, Hastings, Janofsky & Walker, LLP, New York City, by Harvey A. Strickon, for Anthony Siclari.

*DECISION ON OBJECTION TO TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIM AND IN ADVERSARY PROCEEDING SEEKING EQUITABLE SUBORDINATION*

ROBERT E. GERBER, Bankruptcy Judge.

In this case under SIPA[1] for the liquidation of securities broker Adler, Coleman Clearing Corp. ("Adler"), the Court consolidated for trial the objection of Anthony Siclari ("Mr. Siclari") to the determination of Edwin B. Mishkin, Adler's court-appointed trustee (the "Trustee"), denying Mr. Siclari's claim, and the related adversary proceeding commenced by the Trustee against Mr. Siclari seeking equitable subordination of Mr. Siclari's claim. Mr. Siclari, a former accountholder at Hanover & Company ("Hanover"),[2] one of the introducing brokers for which Adler served as a clearing firm, was alleged by the Trustee to be the single greatest beneficiary of the illegal activity at Hanover (and elsewhere) that ultimately led to the failure of both firms.[3]

After trial (and considering, among other things, witness credibility), the Court has determined that Mr. Siclari was indeed the beneficiary of the fraud and other illegal conduct to substantially the extent alleged by the Trustee, and, also, that Mr. Siclari was a knowing beneficiary. For that reason, and the reasons that follow, the Court determines that (1) Mr. Siclari is not entitled to the benefits of SIPA with respect to his claim, and that (2) Mr. Si-

---

1. Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa through *lll* (1970) ("SIPA").

 A SIPA case has many of the characteristics of a chapter 7 liquidation case, but with the important additional consideration, relevant here, that certain claims of brokerage customers, referred to as "customer claims" (generally for the value of cash and securities entrusted with the brokerage firm), are protected (up to certain limits) by the Securities Investor Protection Corporation ("SIPC"), and have the right to share in the fund of customer property (*i.e.,* the fund of customer related *assets, which is not available to satisfy general unsecured claims*), with what amounts to a priority over general unsecured claims, which are satisfied thereafter, and only out of general assets of the estate.

 This substantially simplified explanation is subject to the much more precise and comprehensive explanation of the applicable law in this area by Hon. James L. Garrity, this Court's predecessor, in *In re Adler Cole-*

 *man Clearing Corp.,* 195 B.R. 266, 269–270 (Bankr.S.D.N.Y.1996) ("*Adler I*") (addressing application of SIPA to claims asserted as customer claims based on trading losses and failures to execute customers' orders); *In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 71 (Bankr.S.D.N.Y.1996) ("*Adler II*") (addressing application of SIPA to claims asserted for unauthorized trading); and *In re Adler Coleman Clearing Corp.,* 204 B.R. 111, 114 (Bankr.S.D.N.Y.1997) ("*Adler IV*") (addressing whether assets posted by introducing brokers as collateral under clearing agreements were "customer property").

2. Hanover is the subject of its own liquidation proceeding under SIPA, also before this Court.

3. *See* Transcript of Hrg. of 1/10/01 at 25 ("Hrg. Tr. 1/10/01") (counsel for Trustee arguing that "no one benefited more from the manipulations that went out, went on at Hanover than Mr. Siclari's account").

clari's claim should be equitably subordinated (a) to other customer claims, and (b) to the claims of claimants with general unsecured claims against the Adler estate.

However, for reasons discussed more fully below, the Court does not agree with the Trustee that because Mr. Siclari was used by Hanover personnel as a "nominee" for Hanover in Hanover's transactions for its own account (and even though Mr. Siclari knowingly permitted himself to be used as such), Trustee setoff defenses that would be applicable to Hanover apply also to Mr. Siclari.

For those reasons, Mr. Siclari's objection's to the Trustee's determination are upheld to the extent, but only the extent, of the foregoing, and the Trustee's request for equitable subordination is granted. This decision sets forth the Court's findings of fact and conclusions of law [4] with respect to these determinations.

### Introduction

Along with over 15,000 other account-holders of Adler,[5] Mr. Siclari filed a "customer" claim in Adler's liquidation with respect to the assets—cash and securities—held by Adler on his behalf in his customer account.[6] The Trustee denied Mr. Siclari's claim on the grounds that the account assets for which the claim sought recovery were the fruit of securities law violations, and that those assets were ef-

fectively Hanover assets, and not Mr. Siclari's, because Mr. Siclari's account was used as a nominee account for Hanover's benefit. Mr. Siclari timely objected to that determination, entitling him to a hearing on the matter.[7]

Thereafter, the Trustee also commenced an adversary proceeding, seeking a judgment equitably subordinating Mr. Siclari's claim to the claims of other Adler creditors.

With the support of SIPC, which is allied with the Trustee in connection with this matter, the Trustee has asserted that Mr. Siclari's account was the beneficiary of violations of securities laws perpetrated by Hanover officials—most significantly, Robert Catoggio ("Catoggio"), the trader for Mr. Siclari's account and Mr. Siclari's friend since boyhood, who pleaded guilty to securities fraud. As such, the Trustee has argued, Mr. Siclari's claim should be denied because SIPA protects only innocent customers and innocent customer accounts, and does not permit claimants to receive assets that are tainted by fraudulent conduct. For many of the same reasons, the Trustee also seeks equitable subordination, arguing that it would be inequitable, under these circumstances, for Mr. Siclari to share *pari passu* with innocent Adler customers in the fund of cus-

---

4. *See* Fed.R.Civ.P. 52, as made applicable to adversary proceedings by Fed.R.Bankr.P. 7052, and contested matters by Fed. R.Bankr.P. 7052 and 9014.

5. Adler was a clearing broker. Although its customers were wholly or substantially customers of other, "introducing," brokerage firms, with whom the customers interfaced, the securities in their accounts were held by Adler, the clearing broker.

6. A fair number of the customer claims asserted by other Adler customers have been the subject of contested matters and adversary proceedings considered in this Court and on

appeal. *See, e.g., Mishkin v. Ensminger (In re Adler Coleman Clearing Corp.),* 247 B.R. 51 (Bankr.S.D.N.Y.1999) (Garrity, B.J.) (*"Ensminger"*), aff'd. *in most respects, Jackson v. Mishkin (In re Adler Coleman Clearing Corp.),* 263 B.R. 406 (S.D.N.Y.2001) (Marrero, D.J.) (*"Jackson"*) and the decisions noted in note 1 above.

7. Despite this formulation, which reflects the procedural posture here, no deference has been given to the Trustee's determination, as it might be after an administrative proceeding or appeal.

tomer property, or, indeed, with creditors with general unsecured claims. The Trustee also argues that by reason of the means by which Mr. Siclari allowed his account to be used—allegedly permitting it to be used for the benefit of Hanover— Mr. Siclari was in fact and law Hanover's nominee, and that his claim should be *wholly* disallowed (and not just subordinated), because the claim should be deemed in law to be asserted by Hanover, as against whom the Trustee has a setoff many times exceeding the amount of Mr. Siclari's claim.

As the factual predicate for his contentions, the Trustee alleges that Mr. Siclari profited from Hanover fraudulent activity, and then engaged in transactions to take those gains out of his Hanover account, both for his own benefit and to pass them on to Hanover personnel or Hanover itself. First, as alleged by the Trustee, Mr. Siclari made enormous profits in transactions arranged for him by Hanover:

(1) in initial public offerings ("IPOs") where Hanover was the primary market maker, and where the prices of the stocks that were the subject of those IPOs skyrocketed immediately after the stocks were offered to the public, as a consequence of the manipulation of the stock prices by Hanover personnel; and

(2) by making loans to (a) Hanover and (b) securities issuers for whom Hanover arranged the loans—in each case resulting in extraordinary gains.

Second, as alleged by the Trustee, those profits were channeled to:

(1) Hanover personnel (as a consequence of the transfer of account proceeds to Mr. Siclari's bank account, followed by numerous withdrawals by Mr. Siclari of cash in amounts less than $10,000, structured to avoid reporting requirements under federal law); and

(2) Hanover itself (as a result of intentional losses on day-trades where Hanover was the counterparty).

Third, as alleged by the Trustee, Mr. Siclari engaged in wash sale transactions to boost Hanover's net capital (which was monitored by the SEC and NASD)[8] at the time Hanover had to report it, only to undo those transactions (at the very same price) immediately thereafter.

Mr. Siclari has denied any wrongful conduct on his part, though he does not contest that there was fraudulent and illegal activity on the part of others at Hanover. In that connection, Mr. Siclari argues, among other things, that:

(a) "every single detail in his account was authorized or instigated by him";[9]

(b) he was deposed by the SEC with respect to alleged violations of the federal securities laws by Hanover personnel, and that neither the SEC nor any other federal or state agency, nor the NASD, has indicted him, investigated him or even questioned him concerning those violations;[10]

---

**8.** National Association of Securities Dealers ("NASD"), of which Hanover was a member. As described more fully below, the NASD imposes net capital requirements on its members, generally to assure that NASD members can satisfy their obligations to customers and other brokers, and requires reports of net capital as part of its monitoring function.

**9.** Hrg.Tr. 1/10/01 at 44.

**10.** Discussion of this point will be conspicuously absent in the remainder of this decision. In a hearing in this Court before the trial in this proceeding, the Trustee asserted that after Mr. Siclari pleaded guilty to one count of "structuring" (by reason of cash withdrawals he made from his bank account in a way that would avoid reporting requirements, discussed above and below), the government alleged that Mr. Siclari's securities fraud at Hanover was a ground for enhancing his sen-

(c) the Trustee has put forth no evidence that Mr. Siclari himself participated in, or knew about, the violations of securities laws Hanover officials were found to have perpetrated;

(d) his lifelong friendship with Catoggio should neither implicate him in Hanover's fraudulent activities nor deprive him of "customer" status under SIPA; and

(e) the great bulk—over 75%—of the cash and securities in his account at the time Adler failed as a going concern were the same assets he deposited into his account at the time he started doing business with Hanover (and hence Adler), and as such cannot possibly be the proceeds of illegal activities, and should be entitled to SIPA protection.

## Findings of Fact

Many of the facts relevant to this determination are stipulated to,[11] are established by documentary evidence, or are otherwise objectively verifiable. Others—particularly with respect to motivation, knowledge and intent, and what happened to several hundred thousand dollars of account proceeds taken in the form of cash (*i.e.*, currency, in contrast to checks or anything else that would leave a trail)—are the subjects of circumstantial evidence; as to the latter, the Court made determinations based on reasonable inferences to be drawn (and in most cases, what it considered to be the only reasonable inferences) and the credibility of witnesses.[12] The Court's findings in each of those two cate-

tence. (Hrg.Tr. 1/10/01 at 40). The Trustee made that assertion after Mr. Siclari's counsel had stated that "[t]here was, apparently, an agreement" (*id.* at 38) that the government would not prosecute Mr. Siclari for any alleged criminal activities involving the trading of securities at Hanover, and also:

> [T]he government had made an investigation of those trading activities and had concluded that there was no basis for indicting Mr. Siclari on any charges of illegal trading. He was not named as a co-defendant with Catoggio or any of the other characters, and in fact, nothing other than the structuring charge or nominal charges have been filed against Mr. Siclari.

(*Id.* at 38).

> However, as the Court advised the parties before trial, the Court determined that it would be inappropriate to draw any conclusions based on government inaction. (*Id.* at 41–42). The Court also considered it inappropriate to speculate as to what, if any, other alleged illegal conduct was not charged or prosecuted by reason of the plea of guilty to the structuring. While the Court said it would consider any relevant matter that Mr. Siclari might have said in an allocution, if anything was said in Mr. Siclari's allocution that is relevant to this case, neither side offered it.

11. Mr. Siclari did not dispute a considerable number of the Trustee's proposed findings of fact, which were submitted by the Trustee as an exhibit to the pretrial order, and separately admitted to or disputed by Mr. Siclari. Those proposed findings, insofar as not disputed, are cited here as "Findings ¶ __." In addition, by stipulation of the Trustee and Mr. Siclari, the decision by Judge Garrity in *Ensminger*, to the extent it is relevant to the factual and legal issues presented in this case, is binding in this case; Judge Garrity's rulings were affirmed in most respects (and entirely as to findings of fact) by Judge Marrero in *Jackson*, and Judge Marrero's decision is also binding to the same extent as Judge Garrity's decision in *Ensminger*. Additionally, of course, the Court has made further findings of fact based on documentary evidence, the testimony proffered by the parties and its inferences from all of the foregoing.

12. Pursuant to a procedure put into place by Judge Garrity, with which this Court concurred, this trial was conducted with the receipt of direct testimony by declaration, with cross-examination and any subsequent testimony live in open court. The Court took evidence in that manner from Trustee witnesses John Norris, of Peterson Consulting (relied upon by the Trustee as an expert in the discovery of financial fraud and the reconstruction of books and records that have been manipulated by fraud or other improper activities), and John Lafond, of Lafond,

gories, first with respect to individual transactions and then with respect to the evidence as a whole, follow.

## I.

### Background

On February 27, 1995, the United States District Court for the Southern District of New York (Hon. Loretta A. Preska, D.J.), entered an order pursuant to Section 5(b) of SIPA finding, among other things, that the customers of Adler were in need of SIPA protection, appointing Mr. Mishkin as Trustee, and referring the liquidation proceeding to this Court.[13]

Adler was a securities clearing firm which was registered as a broker-dealer with the Securities and Exchange Commission ("SEC"). It also was a member of SIPC, the New York Stock Exchange ("NYSE"), and the National Securities Clearing Corporation ("NSCC"). Adler acted as a clearing firm, acting on a fully disclosed basis, for some 42 introducing firms, including Hanover; it cleared trades for more than 66,000 customers, including approximately 15,000 Hanover customers.[14]

Hanover was a broker-dealer registered with the SEC, and a member of SIPC and the NASD. Hanover is the subject of its own SIPA liquidation proceeding in this court. Hanover's business primarily consisted of underwriting IPOs of companies and thereafter acting as the primary market maker for the underwritten securities, which came to be known as the "House Stocks," on the NASDAQ small cap market. As the market maker for the House Stocks, Hanover itself would post the price at which it was offering to buy and sell each House Stock on the NASDAQ market. Adler had no means of determining whether the prices Hanover set for the House Stocks were the result of market forces or an arbitrary decision by Hanover.[15]

In addition, Hanover maintained its own proprietary accounts—accounts where Hanover itself had the beneficial interest in the assets in the accounts—with Adler.[16] Hanover, through its proprietary accounts, owned many of the House Stocks and relied on their value to meet net capital requirements imposed by the SEC, which require a broker-dealer to maintain certain

Hagan, Burns and Associates (and formerly with the NASD, relied upon by the Trustee as an expert in (1) determining the nature and character of trading activity and practices in the over-the-counter securities market for customer and proprietary accounts (including an evaluation of whether securities transactions were governed by market forces and identifying nominee accounts and unauthorized trading), and (2) evaluating the practices and procedures of broker-dealers, including the calculation and reporting of broker-dealers' capital condition).

However, Mr. Siclari sought to supplement his direct testimony declaration (which was rather narrow in scope and content) with supplemental direct testimony, and over the Trustee's objection, the Court permitted Mr. Siclari to do so. The Court overruled the Trustee's objection because the Court considered it appropriate to hear as much rele-

vant evidence as possible, and because, in a bench trial, the Court thought it could avoid material prejudice to the Trustee by conditioning its willingness to hear such supplemental direct examination on the Trustee's right to a continuance to cross-examine with respect to any new matter. The Trustee ultimately waived the right to such a continuance.

13. Findings ¶ 1.

14. *See* Findings ¶ 2; *Ensminger,* 247 B.R. at 65–66.

15. *See* Trustee Exh. 37, Norris Decl. of 12/17/96 ("Norris Decl. # 1") ¶¶ 18–20; Trustee Exh. 125, Norris Decl. of 1/13/99 (Norris Decl. # 2) ¶ 16.

16. *See Ensminger,* 247 B.R. at 67.

levels of liquid capital.[17] Hanover proprietary accounts also were used when Hanover customers bought or sold House Stocks. Purchases or sales of House Stocks by Hanover customers normally took place between the customer and one of Hanover's proprietary accounts. House Stock transactions between Hanover customers, or between Hanover customers and other brokerage firms (or their customers), usually took place with the Hanover account acting as an intermediary—a "middleman"—between the parties.[18] Thus, if one Hanover customer sold a House Stock to another Hanover customer, the transaction at least normally was effected by a sale by Customer A to Hanover, and a matching sale by Hanover to Customer B.

Hanover brokers acted as their customers' primary contacts, and, among other things, executed trades on their customers' behalf. The customers' cash and securities, however, were held at Adler, and Adler cleared the trades executed by Hanover and sent account statements and trade confirmations to Hanover customers.[19]

Hanover brought the following House Stock companies public, on their respective dates, during the period Mr. Siclari had an account at Hanover: [20]

| (1) Blue Chip Computerware, Inc., ("Blue Chip Computerware") | August 11, 1992 |
|---|---|
| (2) Mister Jay Fashions Int'l, Inc., ("Mr. Jay") | February 11, 1993 |
| (3) Porter McLeod Nat'l Retail Inc., ("Porter McLeod") | June 21, 1993 |
| (4) All Pro Products, Inc., ("All Pro") | November 9, 1993 |
| (5) American Toys, Inc., ("American Toys") | March 28, 1994 |
| (6) Envirometrics, Inc., ("Envirometrics") | April 29, 1994 |
| (7) Play Co. Toys, ("Play Co.") | November 2, 1994 |
| (8) Panax Pharmaceutical Co. Ltd., ("Panax") | January 18, 1995. |

As discussed more fully below, Mr. Siclari was involved in each of these IPOs, either as (1) a purchaser and seller of shares on the IPO date or (2) as a lender who helped finance the underwriting—by a loan to either (a) the IPO issuer or (b) the IPO underwriter, Hanover.[21]

---

**17.** See *Ensminger*, 247 B.R. at 68 ("The SEC requires broker-dealers to file financial information on a monthly and quarterly basis in the form of a Financial and Operational Combined Uniform Single Report ('FOCUS Report')"). If the broker-dealer falls out of net capital compliance, it must report the violation to its self-regulatory organization, which for Hanover was the NASD. *Id.*

**18.** *Id.;* Norris Decl. # 1, ¶¶ 85–86; Norris Decl. # 2, ¶ 15.

**19.** See *Ensminger*, 247 B.R. at 67; Findings ¶ 3. It is for that reason that Mr. Siclari, while a Hanover customer, filed his customer claim in Adler's SIPA case.

**20.** See Trustee Exhs. 44, 122, 126, and 128.

**21.** However, the Court is not in a position to discuss at comparable length one IPO with which Mr. Siclari was involved, Envirometrics (IPO # 6). The Envirometrics IPO was on May 19, 1994. With two buys and two sells on the day of, and the day after the IPO, Mr. Siclari made a $17,500 profit. However, the evidence that the Envirometrics IPO was manipulated was modest at best, and the Court is not in a position to find that the Envirometrics IPO was manipulated. Also, Mr. Siclari's gains in connection with the Envirometrics IPO were very modest in comparison with his gains on the other IPOs, especially Play Co., All Pro, Panax and American Toys.

## II.

### Mr. Siclari's Hanover Transactions

Mr. Siclari opened an account at Hanover in March 1992, less than a year after Hanover came into existence and approximately seven months after Catoggio began working at Hanover, by transferring approximately $807,700 worth of securities from an account at Waterhouse Securities, and depositing an additional $15,678 in cash. His account remained an open and active account until Hanover closed on February 24, 1995.

The deposit of $15,678 just referred to was the only contribution into his account that Mr. Siclari made during the course of his dealings with Hanover. However, over the course of the same time he transferred out $827,557—an amount greater than the approximately $823,000 he invested—leaving him, even after the "day-trading" losses discussed below, with $655,149 in his account at the time of Hanover's February 1995 failure. Probably by coincidence, the approximately $655,000 in his account at the time of Hanover's failure approximates (though it is slightly less than) the net profits Mr. Siclari made during the time of his investing tenure at Hanover.

The activity in Mr. Siclari's account is noteworthy with respect to four general kinds of transactions, three of which resulted in gains or losses in his account (with two types resulting in gains, and one resulting in losses), and the fourth of which was a wash, but which, the Trustee argues, evidences Mr. Siclari's willingness to allow his account to be used to assist Hanover's fraud. More specifically, the transactions in those four categories can be described as follows:

(a) Gains on loans to Hanover (financing the IPOs of House Stocks Blue Chip Computerware and Mister Jay) and to House Stock issuer American Toys;

(b) Gains as a purchaser and seller of House Stocks in IPOs (principally in House Stocks Panax and Play Co);

(c) Losses as a result of day-trading; and

(d) Purchases and sales at exactly the same price, just before and just after Hanover had to report its net capital.[22]

Those transactions are discussed in turn.

### A.

### Profits on Loan Transactions

1. *Blue Chip Computerware (IPO # 1)*

(a)

Hanover was an underwriter with respect to the offering of Blue Chip Computerware, often referred to as BC Computerware, which took place on or about August 11, 1992. The Blue Chip Computerware IPO consisted of 400,000 "Units," with each Unit (which was initially offered at $5.00) consisting of a bundle (immediately separable) of one share of common stock and one warrant providing the holder with an option to purchase an additional share of common stock at $7.00 per share.[23]

Mr. Siclari's account financed the Blue Chip Computerware IPO; $400,000 was withdrawn from Mr. Siclari's account and transferred to Hanover on August 3, 1992, and $415,000 was transferred back into Mr. Siclari's account from Hanover's account on September 8, 1992. According to the loan documentation provided by the NASD, the $400,000 that was provided by Mr. Siclari was a short-term loan to Hano-

---

**22.** *See generally* Norris Decl. # 2.

**23.** *See* Blue Chip Computerware Prospectus, part of Trustee Exh. 44, at Cover Page, PROS 00367.

ver that was required to finance the Blue Chip Computerware IPO.

For his loan to Hanover of $400,000, Mr. Siclari received back $415,000 approximately 36 days later,[24] representing a gain of 3.75%, or 38% on an annualized basis.[25] However, the loan documents provided that the interest rate was to be 24% per year.[26]

#### (b)

Very little else about Mr. Siclari's dealings in connection with the Blue Chip Computerware loan is as clear, and Mr. Siclari's separate accounts of that transaction cannot be reconciled, either factually or as understandable lapses in memory or inattention to detail. At the trial, Mr. Siclari discussed the transaction in detail—how the transaction was initiated; with whom he met; and the discussions that took place. He explained in his trial testimony that Catoggio and/or Lowell Schatzer ("Schatzer"), Hanover's president,[27] approached Mr. Siclari with respect to financing the underwriting of the Blue Chip Computerware IPO.[28] As he testified to at trial, Mr. Siclari met with Catoggio and Schatzer at Hanover's offices to discuss the possible loan.[29] Mr. Siclari was provided with the prospectus which he testified set forth representations about Blue Chip Computerware's business.[30] Mr. Siclari testified that Darren Lampert, attor-

ney for Hanover, prepared the loan documentation,[31] and that he did not read it himself.[32] Rather, he asked Darren Lampert about the risk level of the loan transaction and was advised that he would lose his entire investment if the stock did not go public as planned.[33]

However, the clarity with which Mr. Siclari testified at trial with respect to the details of the two loan transactions he financed through his Hanover account stands in marked contrast to his deposition testimony taken in 1996.[34] When he was deposed about the first loan he made to Hanover, which would be the loan to help finance the Blue Chip Computerware IPO, Mr. Siclari could not remember anything about the transaction, including whether its purpose was to finance this particular IPO:

Q: Do you recollect if you made any loan in connection with the Blue Chip offering?

A: Blue Chip rings a bell.

Q: Can you tell me anything about the company?

A: I don't remember.

Q: Do you remember if you went to any due diligence meeting?

A: I would not want to speculate. Blue Chip does ring a bell; I remember the stock. I don't remember specifics.

---

24. Norris Decl. # 2, ¶ 34.

25. The arithmetic is by the Court; the $15,000 increment, regarded as interest, is 3.75% of $400,000, earned in 36 days. Dividing by the 36 days and multiplying by 365 days per year, that is equivalent to 38% per annum.

26. *See* Trustee Exh. 123.

27. *See Ensminger*, 247 B.R. at 66 n. 11.

28. *See* Tr. of Hrg. of 3/27/01 and 3/28/01 at 324 ("Trial Tr.").

29. *Id.*

30. *See* Trial Tr. at 327.

31. *See id.* at 326; Siclari November 1996 Dep. 28 ("Siclari Dep. # 1 Tr."); Siclari December 1996 Dep. 301 ("Siclari Dep. # 2 Tr.").

32. *See* Trial Tr. at 329.

33. *See id.*

34. *See* Siclari Dep. # 2 Tr. at 323–336.

Q: Do you remember if they were making money or losing money?

A: No, I don't remember.

Q: Did you ever have a meeting—

A: We are going back four years ago.

Q: You don't remember meeting with anybody from the company?

A: I don't remember.[35]

■ Assuming that Mr. Siclari was telling the truth at the time of his deposition testimony, his testimony at trial cannot be regarded as reliable or credible. While the converse is also true, and the Court cannot rule out the possibilities that Mr. Siclari suffered a convenient lapse of memory when he was deposed, or was not as prepared for his deposition as he might have been,[36] the Court considers it appropriate, on balance, to credit the deposition testimony and reject the trial testimony, especially with all of the trial testimony's newly acquired detail. Common sense tells the Court that witnesses' memories dim with time, not improve. Also, the Court is inclined to believe, in the context of the other evidence discussed below, that Mr. Siclari did not need to, nor did he, discuss or analyze this loan as a commercial or investment banker (or even a modestly attentive amateur) would, in connection with an arms-length investment, because it was not one—because it was arranged by his long-time friend Catoggio, with the understanding that in allowing

his funds to be used for the loan, Mr. Siclari would be taken care of.

### 2. *Mister Jay (IPO # 2)*

#### (a)

Hanover was also an underwriter with respect to the offering of Mr. Jay, which took place about 6 months after the Blue Chip Computerware IPO, on February 11, 1993, and about 5 months after Mr. Siclari was repaid with respect to his Blue Chip Computerware loan. The Mr. Jay IPO consisted of 400,000 "Units," with each Unit (which was initially offered at $5.00) consisting of a bundle (immediately separable) of one share of common stock and one warrant providing the holder with an option to purchase an additional share of common stock at $7.00 per share.[37]

Mr. Siclari's account also financed the Mr. Jay IPO, initially in a manner very similar to the way by which it financed the IPO for Blue Chip Computerware. On February 10, 1993 (apparently the day before the offering, at which time Hanover presumably would have been required to take down and pay for the Mr. Jay Units), either $550,000 or $600,000 was transferred from Mr. Siclari's account to Hanover's account, and on March 17, 1993, about 35 days later, $365,000 moved from Hanover into Mr. Siclari's account.

While the trail traced by the Trustee and the Trustee's experts then turns cold (as the funds traced by the Trustee and his experts did not account for all of the money that left Mr. Siclari's account and went

---

**35.** *See id.* at 352–353; *see also* Siclari Dep. # 1 Tr. at 27–28.

**36.** There was a hint in oral argument by Mr. Siclari's counsel that this was the case, but the Court is not of a view to dismiss Mr. Siclari's deposition testimony so lightly. A deposition is serious business, upon which litigants have a legitimate basis to rely. If, for lack of preparation, Mr. Siclari was not in a position to recall things, he could have said

so then. In any event, the newly recalled detail is so extensive, as compared to the stated lack of recall at the time of deposition, that the Court is not in a position to find, and does not find, that differences are reconcilable as a result of greater attention to the case at the time of trial.

**37.** See Mister Jay Prospectus, part of Trustee Exh. 44, at Cover Page, PROS 00226.

to Hanover), Mr. Siclari provided (in detailed trial testimony once more in considerable contrast to his deposition testimony) a somewhat greater explanation. He testified at trial that his Mr. Jay loan was in the amount of $550,000 (rather than $600,000 noted by the Trustee's expert Mr. Norris),[38] and that $200,000, representing an additional repayment on his loan, was wired to his bank account, and "as soon as it hit, it went back out" to finance the American Toy IPO.[39]

There may, however, be pieces missing from the puzzle. For one thing, some of the documentation provided to the NASD showed a loan of $600,000, and other documentation showed a loan of $550,000.[40] While correspondence from Hanover to the NASD, apparently in March, after the loan and near the time of repayment, sought and obtained the approval of the NASD to prepay a subordinated loan of $550,000, the Trustee's expert Mr. Norris noted that $600,000 left Mr. Siclari's account, rather than $550,000, and the evidence upon which Mr. Norris's observation was based—the underlying financial records—appears more reliable than witness's memories, especially Mr. Siclari's. Assuming, arguendo, that another $200,000 was repaid in the manner Mr. Siclari testified to, that still does not account for all of the money that left Mr. Siclari's account and went to Hanover. Also, the loan documentation provided to the NASD showed

an interest rate of 24%,[41] while Mr. Siclari testified that the rate of interest on his loan was 6% to 7%,[42] and the loan documentation makes no mention of American Toys.[43]

(b)

From those relatively verifiable facts the Court turns to testimony that is harder to verify and reconcile, and the facts that the Court determines as disputed facts. Once more, Mr. Siclari testified in considerable detail at the trial with respect to the loans he made in February–March 1993. His testimony was sufficiently detailed that it went on for seven pages of trial transcript.[44] Yet his testimony at deposition, while not showing as much of a lack of memory as with Blue Chip Computerware, once more showed a dramatically lesser recall of the circumstances surrounding the loan.[45]

At his deposition, Mr. Siclari made no mention whatsoever about the involvement, or lack of involvement, of American Toys in this "bridge loan" transaction. He did not testify that a $200,000 portion of the $550,000 was lent directly to American Toys, an issuer that Hanover later would bring public.

3. *American Toys (IPO # 5)*

(a)

Hanover was also an underwriter with respect to the offering of American Toys,

---

**38.** Findings ¶ 35.

**39.** Mr. Siclari continued that if the Trustee's expert "would have took the time to look at bank wires, he would have saw [sic] that the wire came out of an escrow account, went into another escrow account, went back out to finance the American Toy deal." (Trial Tr. at 334.)

**40.** *See* Trustee Exh. 55.

**41.** *Id.*

**42.** Trial Tr. at 334. However, Mr. Siclari's testimony in this regard is inconsistent with the loan information provided to the NASD, the parties' past dealings, and the risk of such a loan, if (though the Court rejects this as a possibility) the loan was arms-length.

**43.** *See* Trustee Exh. 55 (Mr. Jay Loan Documents).

**44.** *See* Trial Tr. at 330–336.

**45.** *See* Siclari Dep. #.2 Tr. at 295–297, 340–342.

which took place on March 29, 1994,[46] a little more than a year after the Mr. Jay IPO. The American Toys IPO was of 800,000 "Units," with each Unit (which was initially offered at $5.00) consisting of a bundle (at least initially non-separable) of one share of common stock and one warrant providing the holder with an option to purchase an additional share of common stock at $7.00 per share.[47]

American Toys was a majority owned subsidiary of Mr. Jay.[48] It was formed for the purpose of acquiring 90% of the common stock, and 100% of the Series C Preferred Shares, of Play Co., a California based retailer of children's toys;[49] Play Co. itself was brought public in a Hanover-underwritten IPO, from which Mr. Siclari made substantial profits about 7 months later.

However, information with respect to Mr. Siclari's loan to American Toys (which was discussed in part above, by reason of the apparent interrelationship between a loan to American Toys and the repayment of the February 1993 loan to Mr. Jay), particularly of an objectively verifiable nature, is incomplete.

The American Toys Prospectus stated that Mr. Siclari lent American Toys $200,000, for which, in return, American Toys agreed to repay the loan at 7% interest, and to issue Mr. Siclari 50,000 American Toys Units. Then, in return for a stated agreement on Mr. Siclari's part to extend the maturity of the loan, Mr. Siclari was issued another 50,000 American Toys Units,[50] bringing his inventory in those units up to 100,000 Units, which would be registered and sold as part of the American Toys IPO. The 800,000 Units offered in the American Toys IPO included 100,000 Units "on behalf of a Selling Security-holder,"[51] identified elsewhere in the prospectus as Mr. Siclari.[52] In the section,

---

46. Norris Decl. # 2, ¶ 39.

47. *See* American Toys Prospectus, part of Trustee Exh. 44, at Cover Page, PROS 00266.

48. *Id.*

49. *Id.* at PROS 00268.

Upon reviewing the record and exhibits in detail after the trial, the Court came to wonder why Mr. Jay, an apparel company, would own American Toys, a holding company whose purpose was to acquire shares in a California-based toy company (Play Co.). The question was answered, albeit in very small part, by disclosure in the American Toys Prospectus that the organizer of American Toys, Ilan Arbel (who was also president and CEO of Mr. Jay, and who, with his family, owned 70% of Mr. Jay's stock, *id.* at page PROS 00277), had originally intended to purchase Playco for his own account; then offered it to American Toys as a corporate opportunity; and the American Toys Board approved the acquisition. However, as the corporate opportunity was offered to American Toys only one month after Mr. Arbel caused American Toys to be formed; as American Toys, as stated in the prospectus, was incorporated "for the purpose of acquiring Playco," *id.* at page PROS 00273; and as the reason why Mr. Jay, an apparel company, determined that it wanted American Toys was still not disclosed, the Court believes that its puzzlement in this regard remains unanswered.

50. Norris Decl. # 2, ¶ 39. The Court notes that the March 1993 loan date referred to in Norris Decl. # 2 corresponds, at least approximately, to the March 17 time at which repayment was made.

51. American Toys Prospectus, part of Trustee Exh. 44, at Cover Page, PROS 00266.

52. In the section of the American Toys Prospectus captioned "Principal and Selling Shareholders," Mr. Siclari was listed as an owner of 100,000 shares, with a footnote stating, in relevant part:

Mr. Siclari owns 100,000 units, 50,000 of which were acquired in connection with a bridge loan by Mr. Siclari to the Company [American Toys] and 50,000 of which were acquired in connection with an extension of such loan. All of such Units are being sold

"Selling Securityholder," the American Toys prospectus went on to say:

In March 1993, Anthony Siclari, an individual unaffiliated with the Company (the "selling security holder"), loaned the Company the sum of $200,000 which funds were used to effect the purchase of Playco (the "Bridge Loan"). The Bridge Loan was originally payable on the earlier of the Closing of this offering or December 31, 1993. In connection with such loan, the Company issued [Mr. Siclari] 50,000 Units, which Units are being offered for sale by [Mr. Siclari] in this Offering.

In August 1993, the Company and [Mr. Siclari] amended the terms of the Bridge Loan to make it due and payable on June 30, 1994. The Company issued [Mr. Siclari] an additional 50,000 Units as consideration for such extension, which Units are also being offered for sale by [Mr. Siclari] in this Offering.[53]

Another section of the prospectus, captioned "Certain Transactions," disclosed that, after the August 1993 amendment, Mr. Siclari's loan was not payable from the proceeds of the offering, and was due on June 30, 1994.[54] Of the $5.00 per Unit that

investors in the IPO would pay as part of the original offering, the seller (American Toys or Mr. Siclari, as the case may be) would receive $4.50, with the remainder going to underwriting discount, commissions, and/or offering expenses.[55]

After the American Toys IPO, Hanover transferred $664,000 into Mr. Siclari's account. On April 8, 1994 (a Friday), $604,892 was transferred into Mr. Siclari's account with the notation "Jnl from Hanover—Wts American Toys IPO." On April 11, 1994 (the following Monday), another $59,108 was transferred into Mr. Siclari's account with the notation "As of 4/6/94 American Toys."[56] Those two payments aggregate $664,000, which matches up with the sum of $450,000 (for the 100,000 Units), $200,000 (for a repayment of a $200,000 loan) and $14,000 (in interest, 7% on $200,000 for one year).

Neither party contended that the transactions disclosed in the American Toys prospectus did not happen, and the Court finds that the transactions did occur, without making a finding as to whether the disclosures in the prospectus with respect to *why* they happened are accurate or complete.[57] Assuming the disclosures to

---

in this offering. (American Toys Prospectus, part of Trustee Exh. 44, at page PROS 00304 n. 6).

53. *Id.* at PROS 00305.

54. *Id.* at PROS 00311.

55. *Id.* at PROS 00266.

56. Norris. Decl. # 2 ¶ 40.

57. Mr. Norris noted that no financial records that he could examine indicated that Mr. Siclari actually loaned the $200,000 to American Toys; that Mr. Siclari ever traded in American Toys; or that he ever held American Toys Units. (Norris Decl. # 2, ¶ 40). With respect to the first observation, while the Court believes that Mr. Norris accurately described the facts based on the information available to him, the Court believes that this is

more likely the result of the relevant financial records not having been available or produced than suggesting that the loan was a fabrication; the Court accepts Mr. Siclari's testimony that the $200,000 went into American Toys without hitting his bank account (or at least any bank account that the Trustee's expert could examine), and that the loan was in fact made.

The Court does not consider the second observation to be particularly relevant. However the Court considers the third observation (that Mr. Siclari never held American Toys stock) to be highly relevant—but not as suggesting that the loan was never made; rather, the Court considers it relevant as demonstrating a mechanism (and intent) to get money to Mr. Siclari in connection with the American Toys transaction without even bothering to put the Units that

be true,[58] Mr. Siclari was to receive $450,000 as an issuer,[59] plus (if and when the loan was repaid) the $200,000 that was loaned and interest at 7% per annum, which, for the one year loan of $200,000, would mean a total return of $464,000 [60] in excess of the loan amount, or a 232% return on the one-year, $200,000 investment.

The Court saw no evidence that the $200,000 loan was repaid, nor, as significantly, that Mr. Siclari ever communicated with anyone, or took any other steps, to secure its repayment. This, along with the other surrounding facts and circumstances, causes the Court to believe, and find, that the American Toys transaction was not arms-length.

### B.

#### Profits on Allegedly Manipulated IPOs

1. *Porter McLeod (IPO # 3)*

(a)

The Porter McLeod IPO, the first Hanover IPO in which Mr. Siclari participated as an equity security buyer (in contrast to he was issued for his loan (and that he later sold) into his brokerage account.

lender, or recipient of shares by reason of a loan), was on June 21, 1993.[61] The Porter McLeod IPO was of 500,000 "Units," with each Unit (which was initially offered at $5.00) consisting of a bundle (at least initially non-separable) of one share of common stock and one warrant providing the holder with an option to purchase an additional share of common stock at $6.00 per share.[62]

Mr. Siclari was one of the initial buyers of Porter McLeod stock on the day it went public. This was the first time Mr. Siclari ever invested in an IPO (through his Hanover Account) by buying shares. He bought and sold his shares the same day, *i.e.*, the day the company went public. As a result of two trades, a buy and a sell, on the date of the IPO, the Siclari account made $119,960.[63]

(b)

When deposed about the Porter McLeod IPO, Mr. Siclari could not specify what made him purchase the stock or anything about the company itself. He was quite familiar, however, with the company at trial. He testified that it was a construc-

---

**58.** The Court is aware that Mr. Siclari's deposition testimony was flatly inconsistent with the statements in the prospectus (and his trial testimony), and, if believed, would suggest there was no loan arrangement with American Toys:

Q: I am sorry. There was no loan arrangement with you and Hanover as far as American Toys was concerned?

A: No.

(Siclari Dep. # 2 Tr. at 389). The Court's conclusions with respect to its effort to reconcile Mr. Siclari's testimony with the typically inconsistent testimony offered at other times (and with trading records and other more verifiable data) are discussed below.

**59.** Based on a sale of 100,000 Units, at a net to the seller of $4.50 per Unit. *See* Trustee Exh. 44, at PROS 00266.

**60.** *Cf.* Norris Decl. # 2, ¶ 39, which computed the return back to Mr. Siclari at $644,000, an amount lower than the gross return of $664,000 and greater than the net return of $464,000, that the Court would compute. While Mr. Norris' computation may be a typographical error (and in any event, the Court believes that its formulation as described above is more accurate or states substantially the same thing that Mr. Norris was saying in a different way), for the purpose of the analysis here, any differences are not material.

**61.** Norris. Decl. # 2, ¶ 37.

**62.** *See* Porter McLeod Prospectus, part of Trustee Exh. 44, at Cover Page, PROS 000050–000052, and "Prospectus Summary," PROS 000053.

**63.** Findings ¶ 64.

tion company involved in building strip malls. During his deposition, on the other hand, he did not recall whether this was a Hanover IPO, why he chose to buy the stock on the day he did, or anything at all about the company.

### 2. All Pro (IPO # 4)

#### (a)

The All Pro IPO was on November 9, 1993. The day before the IPO, $210,000 was transferred from Mr. Siclari's account to an escrow account for All Pro. On the day of the IPO, Mr. Siclari's account sold 40,000 Units of All Pro (at a price of $5.50 per unit, for an amount received of $219,980), before a "buy" and transfer into his account of such Units was recorded; indeed, Mr. Siclari's account never recorded a "buy" for any All Pro Units. On November 11, 1993, two days after the IPO, Mr. Siclari's account received 41,850 All Pro Units,[64] though his trading account shows two other entries, on December 16, 1993 (with transactions said to have a trade date of November 11), by which 41,850 Units went out and 41,850 Units came in, for reasons that are not clear to the Court.[65] About four months later, on March 6, 1994, Mr. Siclari's account sold 1,650 shares of All Pro, at a price of $11.00 per Unit, for an amount realized of $18,130.

Mr. Siclari sold 40,000 of the 41,650 All Pro Units that were his total (net) acquisition as part of the IPO for about $10,000 more than he paid for all 41,650 Units the day before,[66] and realized an additional $18,130 on the sale of the remaining 1,650 All Pro Units about four months thereafter. Assuming, as the Court believes is appropriate, that the $210,000 wired out of Mr. Siclari's account on the day before the All Pro IPO was in payment for All Pro Units that for some reason were not recorded as a "buy," overall he made a profit of $28,110 with respect to the All Pro Units.[67]

#### (b)

The Trustee's expert John Lafond expressed the opinion that the All Pro IPO was manipulated, and the Court accepts Mr. Lafond's conclusions as true. Indeed, in an administrative release dated September 22, 1995, the SEC announced its own findings that Hanover officials manipulated the All Pro market, based on a consent order (consented to by Hanover traders Catoggio and Garber, and Hanover's president, Schatzer),[68] laying out, in considerable detail, the means by which the manipulation took place.[69]

That manipulation, the SEC found, caused the price of All Pro to rise from $5.00 per share to $12.00 per share on the

---

64. Norris Decl. # 2, ¶ 38; Findings ¶ 65.

65. Also, and again on November 11, 300 All Pro Units apparently came into Mr. Siclari's account and left it on the same day, and the reasons why those transactions took place are also not clear to the Court.

66. $9,980 to be exact, representing the difference between the $219,980 received for the 40,000 Units sold on the date of the IPO and the $210,000 wired out of account the day before.

67. That is the result upon addition of the amounts realized of $219,980 on the November 11, 1993 date of the IPO and the $18,130

on March 4, 1994, and subtracting the $210,000 paid for the All Pro Units the day before the IPO. It corresponds in amount to the amount computed by the Trustee's expert Mr. Norris. See Norris Decl. # 2, ¶ 38; Findings ¶ 65.

68. They consented to the entry of the SEC's order without admitting or denying the SEC's findings, but consented to the entry of the findings. See Trustee Exh. 43 at page HREG 0022.

69. Id. at HREG 0022–0023.

first day of aftermarket trading.[70] Catoggio was barred from the securities industry and fined for his role in manipulating the All Pro market.

The Court finds that Mr. Siclari's gains in All Pro were the result of a manipulated market.

### 3. *Play Co. (IPO # 7)*

#### (a)

The Play Co. IPO was on November 2, 1994; the offering was of 700,000 "Units," with each Unit (which was initially offered at $5.00) consisting of a bundle (at least initially non-separable) of one share of common stock and one warrant providing the holder with an option to purchase an additional share of common stock at $7.00 per share.[71] Mr. Siclari bought 26,000 Play Co. Units on the day of the IPO, at a cost of $130,023.[72] He sold 25,000 of those Units the same day, for an amount realized of $484,382.[73] About seven weeks later, he sold the last 1,000 of those Units for $21,227.[74]

Thus, with the buy and sell of substantially all of the Play Co. Units on the day of the IPO and the clean-up sale of the last 1,000 of them about seven weeks later, Mr. Siclari made $375,556.[75] Although he was only in the market for a few hours, with the 25,000 shares he sold on the day of the IPO, Mr. Siclari made a profit of approximately $14.38 per share, or a 287% return.[76]

Of Hanover's approximately 15,500 customers, only one made more money that Mr. Siclari did on the Play Co. IPO;[77] of the ten customers who made the most profit from the Play Co. IPO, eight were customers of Robert Catoggio.

#### (b)

The Trustee's expert Mr. Lafond concluded that the IPO for Play Co. shares was manipulated, and that the approximately $375,556 profit that Mr. Siclari made in connection with this IPO represented proceeds of a manipulated market.[78] For the reasons stated by Mr. Lafond, and after independent consideration, the Court regards that opinion as strongly supportable, and it so finds. The Units in Play Co., a small toy retailer in competition with Toys R Us, a business that was hardly novel or cutting edge, were offered at the usual $5.00 per share price on its IPO date, and on that same day, within the Hanover group of customers, the price jumped to over $25.00 per share. Of the 1.2 million shares bought by Hanover customers that day, only 7,500 or .06% of

---

70. *See id.* at HREG 0023; LaFond Decl. ¶ 22; *see also Ensminger*, 247 B.R. at 89 n. 57.

71. *See* Play Co. Prospectus, part of Trustee Exh. 44, at Cover Page, PROS 00438.

72. *See* Trustee Exh. 56 at TR–SICLARI 00009. That is the approximate cost for 26,000 Units at the IPO offering price of $5.00 per Unit, which would be $130,000.

73. *Id.* For the 25,000 Units sold, that represents an average sale price of $19.38 per Unit.

74. *Id.* For that last 1,000 Units sold, that represents an average sale price of $12.23 per Unit.

75. Based on the sum of the amounts realized, $484,382 and $21,227, less the amount paid of $130,023. Mr. Norris computed the gain to be $375,556 (Norris Decl. # 2, ¶ 42), an amount not materially different.

76. Norris. Decl. # 2, ¶ 42.

77. That was an account held by an entity called Sparten Establishment ("Sparten"). Sparten's account will become relevant again later in the discussion; it was also a Catoggio account and shares some of the same characteristics of the Mr. Siclari account.

78. Declaration of John J. Lafond ¶ 45 ("Lafond Decl.").

them, were purchased while the market rose from \$5.00–\$22.00. Customer sales *started* at \$19.25;[79] intervening trades at prices between the \$5 IPO price and \$19.25, causing the stock to move up to that level in price, were conspicuously absent. Neither the prospectus nor any information disseminated to the public indicated a positive intrinsic value for Play Co. that would have lead prices to soar as they did.[80] Indeed, Play Co.'s prospectus showed that although the company was generating revenues, it lost 1.7 million in 1994, the year it went public, and \$92,978 in 1993.[81] It was not current on accounts payable, had violated loan covenants and had not ever paid a cash dividend.[82]

### (c)

At trial, Mr. Siclari testified that he did not rely on the prospectus or do any due diligence in determining whether to invest in this IPO. He offered, as a reason for buying the Play Co. shares, that he thought: "[T]he toy line was a good way to go. I saw at the time they—I had three kids at the time and I saw how much I spend on toys, so that's why I invested in the company."[83]

### 4. *Panax (IPO # 8)*

The Panax IPO, the last IPO in which Mr. Siclari invested, took place on January 18, 1995,[84] about a month before Hanover's fall. Mr. Siclari bought 35,000 Panax Units on that day, at a cost of \$175,023.[85] He sold all 35,000 of those Units the same day, for an amount realized of \$691,227.[86]

Thus, with the buy and sell of that large number of Panax Units on the same day, the date of the IPO, Mr. Siclari made \$516,204.[87] Although he was only in the market for a few hours, with the 35,000 shares he sold on the day of the IPO, Mr. Siclari made a profit of approximately \$14.75 per share, or a 295% return.[88]

Of Hanover's approximately 15,500 customers, none made more money that Mr. Siclari did on the Play Co. IPO; the two customers who made the most profit from the Panax IPO were both customers of Catoggio.[89]

### (b)

The Trustee's expert Mr. Lafond concluded that the IPO for Panax shares was manipulated, and that the approximately \$516,204 profit that Mr. Siclari made in connection with this IPO represented proceeds of a manipulated market.[90] For the reasons stated by Mr. Lafond, and after independent consideration, the Court regards that opinion as also strongly supportable, and it so finds.

Panax employed an 84–year–old Russian botanist to search for plant life that could

---

**79.** *See id.* at ¶ 50; Trustee Exh. 126 (Play Co. Trades).

**80.** *See* Lafond Decl. ¶¶ 46–49.

**81.** *See* Trustee Exh. 44.

**82.** *Id.*

**83.** Trial Tr. at 349–350.

**84.** *See* Trustee Exh. 44, at Cover Page, PROS 00001; Findings ¶ 73.

**85.** *See* Trustee Exh. 56 at TR–SICLARI 00010. That is the approximate cost for 35,000 Units at the IPO offering price of \$5.00 per Unit, which would be \$175,000.

**86.** *Id.* For the 35,000 Units sold, that represents an average sale price of \$19.75 per Unit.

**87.** Based on amount realized, \$691,227, less the amount paid of \$175,023. Mr. Norris' computation of the gain was identical in amount. *See* Norris. Decl. # 2, ¶ 43.

**88.** *Id.*

**89.** *Id.*

**90.** Lafond Decl. ¶ 45.

be used to develop holistic medicines.[91] As set forth in its prospectus, Panax, which was organized in May 1993,[92] about 20 months before the IPO, had no ongoing business,[93] had not generated any revenues since the commencement of its operations, and had suffered a loss of $461,230 [94] through the September preceding its January 1995 IPO. Panax had "suffered cash flow and liquidity problems," depending for its funding on demand loans from officers and directors and their affiliates and demand bridge loans from others,[95] and expected to incur "significant additional operating losses" over the next several years. It was subject to the political and currency risks of business operations in Russia and other countries then part of the Commonwealth of Independent States.

Perhaps most significantly, the very first Risk Factor laid out in Panax prospectus was the disclosure that its auditors had issued a "going concern" warning—that Panax's operating losses, capital deficiency, its need for substantial additional financing to complete its research products and to develop commercial acceptable products "raise substantial doubt about [the Company's] ability to continue as a going concern." [96]

Within the Hanover group of customers, the Panax share price jumped from $5.00 to $19.00 on the first day of trading without any material intervening trading.[97] Indeed, no Hanover customer *sold* until the price reached $19.50.[98]

Neither the prospectus nor any information disseminated to the public indicated an intrinsic value for the company that would lead share prices to skyrocket in the way they did.

(c)

Mr. Siclari did not deny that the Panax IPO was manipulated. In essence, his testimony was that "if it was manipulated, I didn't know about it." [99] However, the Court is not in a position to accept this testimony as credible.

To the contrary, the Court believes that Mr. Siclari would not have invested so much in an investment like this one if he did not have substantial comfort that he would be taken care of. Mr. Siclari did not have an MBA in finance, training as a financial analyst, or the training or experience of a sophisticated professional investor, but he was not a fool. And what made this investment not foolish was an understanding on Mr. Siclari's part that the steps his friend Catoggio would take would

---

91. Trustee Exh. 44, at page PROS 00008.

92. *Id.* at PROS 00003.

93. *Id.* at PROS 00026.

94. *Id.* at PROS 00007.

95. *Id.*

96. Panax Prospectus, part of Trustee Exh. 44, at page PROS 00006.

97. *See* Lafond Decl. ¶ 50; Norris Decl. # 2, ¶ 57; Trustee Exh. 128 (Panax IPO Trades).

98. *See* Norris Decl. # 2, ¶ 57; Lafond Decl. ¶ 50; Trustee Exh. 128.

99. When cross-examined at trial, Mr. Siclari himself could offer no reasonable explanation why anyone would have bought shares at $19 or more. Mr. Siclari testified that if manipulation caused the price to jump so drastically, he was unaware of it:

Q: Mr. Siclari, are you saying ... that you think there were any buys between 5 and 19 in this stock?
***
A: What I'm saying to you, Mr. Lowenthal, there had to be because how could the stock have gotten from 5 to 19.
Q: Absent manipulation?
A: Well, if there was, Mr. Lowenthal, I am unaware of it.
(Trial Tr. 430).

turn such an economically foolish investment into a profitable one.[100]

## C.

### Day–Trading Losses, as Alleged Means to Pass Cash to Hanover

#### (a)

In addition to the transactions noted above, Mr. Siclari's account was also noteworthy for its day-trading—trading in which the same stock was purchased and sold on the same day, or substantially so. Twelve transactions of that character—twelve pairs of buys and sells—took place.[101] Such transactions (initially two of them) began in December 1992.[102] They then ceased for a period of about three months, after which five more took place in March, April, June and July 1993.[103] They then ceased for a period of approximately nine months, after which five more took place in April 1994. No more took place after that date.

In *every one* of those 12 transactions, Mr. Siclari lost money.[104] All in all, he lost $655,505 in those 12 transactions. The losses ranged from a low of $4,440 to a high of $154,040. In the month of April 1994, in which 5 of the 12 transactions took place, Mr. Siclari lost a total of $421,450.

In April 1994, as noted above[105]—on Friday, April 8, and Monday, April 11, 1994—a total of $664,000 came in to Mr. Siclari's account; it came as a result of Mr. Siclari's sale in the American Toys IPO of American Toys Units that had been issued to him in consideration of his making the bridge loan to American Toys and (at least as stated) agreeing to extend the bridge loan's maturity. On the day after the April 11 receipt of the second of the American Toys payments, Tuesday, April 12, 1994, Mr. Siclari engaged in the first of the losing April 1994 day-trades, losing $47,540. The next day-trade came the day after, Wednesday, April 13, 1994, in which he lost $155,040. The day after that, Thursday, April 14, 1994, Mr. Siclari engaged in the next one, losing $62,540. The day after that, Friday, April 15, 1994, he engaged in the buy that was closed on the following Tuesday, April 14, in which he lost $100,040. Finally, on the next Monday, April 25, 1994, he engaged in his final day-trading buy, which was closed on the following Thursday, April 28, in which he lost $56,290.

Hanover passed all of those trades through its proprietary accounts.[106] Thus the counter-party in each of these day-trades was not "the Street," or a third-

---

**100.** Mr. Siclari's explanation at trial was not the type one would expect from an individual who was for all practical purposes a professional investor at the time, living off his profits at Hanover:

> Panax was the most intriguing company of all to me. It dealt in holistic medicines from plant life to cure various diseases. And I, particularly, I believe—I, personally in my own life, drink juice drinks and stuff like that and that's why I had a large interest in Panax.

(Trial Tr. 350).

**101.** All references are to pairs of a buy and a sell. In one of the 12 cases, the buy took place on a Friday (April 15, 1994) and the

sale took place on a Tuesday (April 20, 1994), and in another case the buy took place on a Monday (April 25, 1994) and the sale took place on a Thursday (April 28, 1994). The other 10 pairs took place on the same day in each case.

**102.** Norris Decl. # 2, ¶¶ 50–51; Trustee Exh. 126.

**103.** Norris Decl. # 2, ¶ 51.

**104.** Findings ¶ 111.

**105.** *See* page 21 above.

**106.** Norris Decl. # 2, ¶ 52.

party investor; it was Hanover. As a consequence, every one of these losses was Hanover's gain. Putting it another way, Hanover benefited to the same extent that Mr. Siclari was prejudiced as a consequence of Mr. Siclari's trading losses in each of those 12 transactions.

It is noteworthy, in this connection, that all but two[107] of the day traded securities were *non*-House Stock securities—where Hanover was not the market maker, but nevertheless was somehow the counterparty to every one of those trades. Normally, for a trade in which Hanover was not the market maker, the customer would trade directly with the "Street," and Hanover would act only on an agency basis; it would not ever (even momentarily) own the securities. But even though Mr. Siclari's day-trades, with only those two exceptions, involved non-market maker stocks, Hanover still ran these trades through its proprietary accounts, on a principal basis, and it was the counterparty to each buy and sell.

### (b)

The Trustee's expert Mr. Norris concluded that Hanover used trading devices to transfer money from Mr. Siclari's account.[108] In addition to the objectively verifiable facts set forth above, Mr. Norris observed that armed with the knowledge, in hindsight, of the trading in a given security on a given day, it would be easy for Hanover to create bogus buys and sells that would create losses in the trading of that security, so long as both the buy and the sell were with Hanover as a principal,
and not as an agent for a buy or sell with the Street.[109] This would demonstrate both the opportunity and the means to channel money from Mr. Siclari to Hanover, representing a portion (but considerably less than all) of Mr. Siclari's gains.

Based, once more, on Mr. Norris' testimony and the Court's independent analysis, the Court agrees with Mr. Norris' conclusion that the day-trading was used as a means to funnel cash to Hanover, and the Court so finds. The Court's conclusion in this respect was informed particularly by the proximity between the receipt of the $660,000 American Toys IPO and the day-trades beginning the day after the second installment of the American Toys cash was received (after a day-trading hiatus of nine months), and the oddity that Hanover would be acting as a principal with respect to securities for which it was not a market maker. Neither, in the Court's view, can be passed off as coincidence.

### (c)

When asked at his deposition about his reasons for conducting certain day-trades, Mr. Siclari could not remember the reasons he conducted them, and in some instances, could not remember the trade itself.[110] At the trial, now putting forward a reason for these day-trades (albeit not a very specific reason), Mr. Siclari testified that his "addictive personality" might have led him to engage in day-trading.[111] Significantly, Mr. Siclari did not say that any of those trades was unauthorized, perpetrated on him by Catoggio or other Hanover personnel, or otherwise not an inten-

---

107. *Id.* The exceptions, the only two for which Hanover made a market in the stocks, were Mr. Jay and Tower Air. *Id.*

108. *Id.* ¶ 50.

109. This presumes, of course, a willing customer, who would not complain of unauthorized trading, or of the resulting losses, in huge amounts, and/or who would state that he had in fact authorized each of the two elements of each pair of trades on each day.

110. *See generally* Siclari Dep. # 2 Tr. at 310–314; 331–333; 338; 344–345.

111. *See* Trial Tr. at 355.

tional act on his part.[112] Nor did he testify as to any discussions with Hanover personnel, or anyone else, that might reasonably be expected of an investor who had lost more than $650,000 in a dozen transactions, not one of which had been profitable.

If Mr. Siclari had asserted that the day-trading in his account was unauthorized, perpetrated solely by Catoggio and discovered only after the fact, this Court would not necessarily have found such an explanation implausible, and would have a much more difficult case to decide. But Mr. Siclari's repeated statements in his testimony that he authorized each and every transaction require the Court to believe that Mr. Siclari was either a knowing participant in the day-trades or knowingly accepted their results—even with their extraordinarily large losses. The Court is unsure whether Mr. Siclari was untruthful when he insisted that he authorized every single trade (which would, of course, include the day-trades) in advance, or whether he did direct them in advance, by agree-

ment with Catoggio—but the Court is sure that the day-trade results could not have been, and were not, the result of bad luck in trading, or the result of an "addictive personality" coupled with such bad luck.

The Court concludes, and finds as a fact, that as either authorizing the day-trades (with recognition of their effect), or by accepting their result (again with recognition of their effect), Mr. Siclari was the ally of Catoggio, not Catoggio's victim or innocent tool.

### D.

### Wash Sale Transactions, as Alleged Means to Inflate Hanover Net Capital

#### (a)

As a broker-dealer, Hanover was required, pursuant to SEC Rule 15c3–1, to measure its solvency and liquidity by calculating its net capital.[113] Broker-dealers

---

112. Indeed, in this connection (in response to questions by the Court that emanated from a concern on the part of the Court that Mr. Siclari might have been a victim of unauthorized trading), Mr. Siclari testified that as a general rule, he received monthly statements from Hanover with respect to activity in his account; and that as a general rule, he read them, though with varying degrees of attention. (Trial Tr. at 466–467). With respect to those monthly statements, he continued (in response to questions by the Court):

> Q. As a general rule, did you look at them with the degree of attention sufficient to ascertain whether there were any transactions on there that you didn't agree with?
> A: That's—I was going to expand on my last answer, and that is correct, Your Honor. When there would be transactions, those are the times it wouldn't be a glance over, it would be item for item.
> Q: And is it fair for me to conclude that that was true with respect to the entirety of your time that you were at Hanover Sterling?
> A: I believe that's a fair statement, Your Honor.

> Q: ... I understood you to say that you either directed or authorized the various transactions that were in your account over the time that you were over at Hanover Sterling. What did you mean when you said that in your testimony today?
> A: That nobody was allowed to make a trade in my account other than myself. It wasn't what they would call discretion account, that a broker could make a trade on his own. I had to make—I made the trade.
> Q: Were there trades you didn't know about [when] they were being made, but you authorized after they were made?
> A: No, Your Honor.
> Q: It's your testimony that every transaction you authorized before it took place?
> A: That is correct....

(Trial Tr. at 467–468) (transcription error corrected, reference to immaterial exception in last answer deleted).

113. *See* Trustee Exh. 38 (Press Declaration). In addition, Joel Press submitted a declaration, dated December 17, 1996, in *Ensminger* that was stipulated by the parties here to be part of the record in this case. The Trustee

are obligated to maintain a certain net capital, *i.e.* net worth with various adjustments,[114] to protect the investing community. The SEC requires brokers to compile monthly and quarterly reports, in a form prescribed by the SEC entitled the Financial and Operational Combined Uniform Single Report ("FOCUS Report"). The FOCUS Report contains the broker's net capital calculation, as well as other pertinent financial and operational information.

A characteristic of the means by which net capital is measured is that, not surprisingly, much turns on the liquidity of the underlying assets, and the extent to which their perceived value (and the value carried on a company's books) can be regarded as fairly realizable. Cash is a highly liquid asset, whose value is objectively determinable. Securities of widely traded public companies might be regarded as in a middle category. Securities of small companies whose trading market is thin, and/or that are not readily marketable, are at the other extreme. The uncertainty of realization of the value of securities of the latter category—which would include the House Stocks, which were owned in large quantities by Hanover, and whose realization value would be regarded by many as uncertain—requires broker-dealers to take a "haircut" with respect to the stated value of such securities for purposes of determination of net capital.[115]

As a consequence of massive short selling by outsiders with respect to the House Stocks, and Hanover's efforts to buy up as many House Stocks as it could to deal with the short selling problem, by early 1995 Hanover found itself in a very weak net capital position. Hanover's FOCUS Report dated January 31, 1995 reflected that at the end of January 1995, Hanover had an excess net capital of only $162,000—a decline of approximately 95% from one month before. Whether or not Hanover's net capital would be even as much as that would depend upon the extent to which the reported net capital was not deceptive—and in particular, the degree to which Hanover's assets consisted of cash or more liquid assets, on the one hand, or House Stocks, on the other.

With that by way of context, the Trustee points to a number of transactions in Mr. Siclari's account which, the Trustee argues, were intended by Hanover to permit it to report a stronger financial position, by substituting cash or cash receivables for House Stocks. To do so, the Trustee argues, Mr. Siclari's account and the account of another Catoggio client, Sparten Establishment ("Sparten"), entered into what in substance were wash sales, buying House Stocks from Hanover, just before the benchmark date for the FOCUS report (and thereby substituting cash as an asset for the House Stock, which for valuation purposes would be subject to a haircut),

relied upon Press in *Ensminger* as an expert in the calculation of net capital under the 1934 Act, and the rules and regulations promulgated thereunder. *See Ensminger,* 247 B.R. at 66 n. 10. Mr. Lafond also incorporated into his declaration paragraphs 16–19, 21–29, 33 and 44 of the Press Declaration. *See* Lafond Decl. ¶ 12.

**114.** Judge Marrero explained the net capital calculation:

Net capital is calculated by subtracting from a broker-dealer's total capital "the

aggregate of certain non-allowable assets, operational charges and 'haircuts'." [*Ensminger,*] 247 B.R. at 68. "Haircuts" represent charges against net capital to assess the real market value in a broker-dealer's proprietary accounts and to account for the risk level of the broker and the concentration of stock in its proprietary account for which it is the market-maker. *See id. Jackson,* 263 B.R. at 419.

**115.** *See* Judge Marrero's explanation in note 114, above.

and selling them back to Hanover, just after the benchmark date, at identical prices.

Putting aside, for the time being, intent on the part of Hanover personnel and Mr. Siclari, the basic underlying facts are straightforward.

A key date for the computation for net capital for an upcoming FOCUS Report was January 31, 1995. At the time in question, stocks trades settled in five business days.[116] In a period stretching over 12 business days, and straddling the January 31 benchmark day, each of Sparten and Mr. Siclari engaged in purchases of the House Stocks, for a total of $1,497,546, in value, and sales of the House Stocks, for a total of $1,506,158 in value,[117] with the effect of boosting Hanover's reportable net capital by the amount of the purchases on the January 31, 1995 date in between. Each of Sparten and Mr. Siclari was a Catoggio client.

On Friday, January 20, 1995, Sparten bought 70,000 shares of Play Co., a House Stock. The cost for that purchase was $14.25 per share, or $997,523. The trade would settle on Friday, January 27, 1995, providing cash into Hanover of that amount, which would thus be reportable as cash on Hanover's part on January 31. On Thursday, January 26, 1995 (before Sparten's Play Co. purchase had even settled), Sparten sold those 70,000 shares of Play Co. The sale (at $14.375 per share, for a total of $1,006,227) settled on February 1, at which time Hanover would be obligated to pay Sparten for them, decreasing its cash to that extent—but only after the January 31 date that mattered.[118]

Likewise, on the business day just after the Sparten purchase, Monday, January 23, 1995, Mr. Siclari bought 100,000 shares of Physicians Computer Network Inc. ("PCNI"), a House Stock. The cost for that purchase, at $5.00 per share, was $500,023. The trade would settle on Monday, January 30, 1995, providing cash into Hanover of that amount, which would be there on January 31. On Monday, January 30, 1995 (the same day as the purchase would settle), Mr. Siclari sold half of it (50,000 shares), at the same $5.00 per share price. He sold the other half (50,000 shares) the next day, at the same $5.00 per share price. Each of those sales would settle on February 6 and/or February 7, at which time Hanover would be obligated to pay Mr. Siclari for them, decreasing its cash to that extent, but, again, only after the January 31 date that mattered.[119]

Significantly, the Sparten sale took place even before the Sparten purchase settled. Significantly also, the first Siclari sale (in the amount of half of his purchase) took place on the day his purchase settled; the second Siclari sale (of the remaining half) took place the next day. In each case, Sparten or Mr. Siclari, as the case may be, sold the exact same number of the shares that had just been purchased, and whose purchase either had not yet even settled (Sparten), or was to settle the same day or one day earlier (Mr. Siclari).[120]

116. Settlement is the time by which a buying customer must pay for securities purchased, and a selling customer must deliver the securities to the buyer. After the time period relevant here, the time for settling trades was reduced to a shorter period.

**117.** Looking just at the purchases and sales by Mr. Siclari, his purchase (one transaction) was of $500,023, and his sales (two transactions) totaled $499,931.

**118.** Findings ¶ 115.

**119.** *Id.*

**120.** In this same time period, Hanover wired out of its proprietary accounts $1.7 million, funds that were never recovered. However, it

### (b)

Sparten admitted that the trades made on its behalf in this time period had been unauthorized and unknown to it, and abandoned its claim.[121]

By contrast, Mr. Siclari took the position in his trial testimony that these transactions were both authorized and genuine. In his testimony at trial, Mr. Siclari testified that Catoggio recommended PCNI to him, explaining that many Hanover customers were buying the stock and that it had the potential to take off.[122] Mr. Siclari testified that his sale of the shares in two blocks was the result of a compromise with Catoggio; Catoggio, according to that trial testimony, did not want Mr. Siclari to sell any shares, and Mr. Siclari wanted to sell *all* the shares, because he felt that the stock was too risky and tied up his purchasing power. According to Mr. Siclari's trial testimony, after a conversation with Catoggio about their respective concerns, he and Catoggio agreed that Mr. Siclari would hold onto half the shares for a while longer, and sell half the shares immediately.

The Court is not in a position to find this account credible either. The Court rejects this testimony not just for its inherent implausibility, but for other reasons as well, including, most importantly, the failure to account for the extraordinary significance of the January 31, 1995 date; the inability to reconcile it with the parallelism in the Sparten account; and, of course, Sparten's very different account. Also, the testimony is belied by the trading history facts: Mr. Siclari sold the first half of the shares on the very day their purchase would settle, and then sold the remaining half the next day; he had hardly tied up his purchasing power,[123] and the trading records reflect that he did not hold on to the remaining shares "a while longer." [124]

is not clear to the Court whether there is any connection between those wire transfers and the wash sale transactions, and the Court is not in a position to find that there was such a connection.

**121.** *See* November 7, 1996 Deposition of John R. Cathersides (principal administrative officer of Sparten) 126:11–20; Trustee Exh. 136 (Stipulation and Order of Dismissal for Sparten, November 14, 1997, Bankr.S.D.N.Y. (Garrity, B.J.)).

The effect of such admission and abandonment was to give up on the right to recover over $900,000 to which Sparten might have been entitled—the receivable on the second half of another wash sale, whose purchase took place on February 1—if its trades had been authorized. The Court regards it as highly unlikely that Sparten would have abandoned the potential receivable if it had, in fact, authorized the trades; Sparten's statement that the trades had *not* been authorized was a species of declaration against monetary interest, with respect to which (putting aside its admissibility as an exception to the hearsay rule) the Court believes that it is unlikely that Sparten's statement was untruthful.

**122.** *See* Trial Tr. at 471–472. Mr. Siclari so testified even though he had also testified that Catoggio recommended stocks to him only 3–4% of the time, *see* Trial Tr. 470, and that instances in which Catoggio recommended a stock at all would be rare.

**123.** There do not appear to have been any significant purchases in Mr. Siclari's account just after January 31, when the purchasing power would have been restored, and in his most recent trades prior to that date, involving Panax, Mr. Siclari had just made more than $500,000, giving him materially greater purchasing power—though to be sure, just before and just after January 31, substantial sums were wired out of Mr. Siclari's Hanover account to his bank account, and then, withdrawn as currency. *See* discussion of cash transactions on page 53, below.

**124.** Indeed, at trial, Mr. Siclari made a series of inconsistent statements. Moments before he told the Court of his uneasiness about tying up his account funds in a highly speculative PCNI stock, he said that he was "aggravated" because the trade was a flat buy-sell (*i.e.*, no profit was generated); and that if he had held

At trial, the Trustee argued with considerable force that the parallel transactions effectuated in the accounts of Sparten and Mr. Siclari—both Catoggio accounts, in the exact same time frame, with the exact same economic effect (buys and sells of the exact same numbers of shares), undoing transactions as soon as they settled (or even before), and with the effect of boosting Hanover's apparent net capital on the key date of January 31—had both the purpose and effect of aiding Hanover in a fraudulent representation as to its net capital. The Court so finds; the evidence of that is overwhelming. Indeed, Mr. Siclari's testimony that the transactions reflected normal trading is so ludicrous that the Court not only finds it unpersuasive with respect to this aspect of Mr. Siclari's dealings with Hanover; the Court wonders how much of anything else to which Mr. Siclari testified can be regarded as credible as well.

If Mr. Siclari, like Sparten, had asserted that the PCNI trading in his account was unauthorized, perpetrated solely by Catoggio and discovered only after the fact, this Court would not necessarily have found such an explanation implausible, and would have a much more difficult case to decide. But Mr. Siclari's vigorous urging, under oath, of an explanation that is so plainly untrue causes the Court to believe, even more strongly, that Mr. Siclari was the ally of Catoggio, not Catoggio's victim or innocent tool.

### III.

### Surrounding Circumstances

### A.

### The Failures of Hanover and Adler

In or about January 1995, certain short sellers (not linked, so far as the record reveals, to Mr. Siclari) began to short the House Stocks. To relieve the downward pressure on the price of the House Stocks caused by the short selling, Hanover responded by purchasing the House Stocks that were being shorted by the short sellers. That resulted in a substantial drain on Hanover's capital. Hanover attempted to pass off as many of these House Stock positions to its customers as possible. Sometimes Hanover sold House Stocks to its customers and sometimes Hanover placed unauthorized purchases in customer accounts to offset the pressure on Hanover's proprietary accounts. In other words, by means of the unauthorized purchases, Hanover caused its customers to buy House Stocks from Hanover's own inventory in its proprietary accounts.

Despite those efforts, Hanover's purchase of House Stocks from the short sellers rapidly depleted Hanover's capital reserves, particularly the net capital that Hanover would be required to maintain and report on to the NASD. Hanover ceased doing business on Friday, February 24, 1995.[125]

During the last two weeks of Hanover's life,[126] in a last attempt at salvaging cus-

---

onto the stock a little longer, he could have made more money. *See* Trial Tr. at 472.

125. *See* Findings ¶ 12; *Ensminger,* 247 B.R. at 73.

126. Many of the trades conducted the two weeks before Hanover's close, the "Final Week Trades," were the subject of *Ensminger.* The proper treatment of the claims with re-

spect to those trades was resolved by Judge Garrity in *Ensminger,* whose decision was affirmed in most respects (and in all respects relevant here) by Judge Marrero in *Jackson,* and is not at issue here. Judge Garrity upheld the Trustee's denial of many of the claims in *Ensminger* because the claimants did not authorize the challenged trades or did not have enough funds to purchase the blue chip buys recorded in their accounts. Judge

tomers they perceived as favored, due to their large accounts and/or special relationships with brokers, Hanover traders, including Catoggio, dumped House Stocks from those favored accounts, and purchased blue chip securities with the proceeds. In this way, Hanover traders attempted to facilitate favored customers' recoveries under SIPA.

Mr. Siclari's account and his children's accounts were examples of such favored accounts. On February 21, 1995, four days before Hanover's close, Mr. Siclari's children's accounts sold all of their House Stocks shares.[127] These sales resulted in a cash balance in each of the three children's accounts of under $12,000.

On the same day, Mr. Siclari's account held approximately $407,000 in cash.[128] SIPA, however, would provide no more than $100,000 in cash protection. Mr. Siclari's account then used nearly all of its cash to purchase almost $400,000 worth of Amgen, a well-known blue chip stock.[129] Mr. Siclari also withdrew $200,000—the largest cash withdrawal ever effectuated in his account at Hanover—the day before it closed.[130] Because his account did not contain enough cash to support this withdrawal, this was, in effect, a margin loan from Adler, leaving Mr. Siclari with a negative cash balance on the day Adler closed.

Activity during Hanover's final week was unprecedented,[131] with the notable characteristic of Hanover booking blue chip purchases in accounts that held more than $100,000 in cash.[132] This, Judge Garrity found, was not by chance.[133] Hanover knew by this time that it was insolvent, and chose to protect certain favored customers by attempting to maximize their recovery in a forthcoming liquidation proceeding.[134]

Notwithstanding Judge Garrity's findings in *Ensminger,* Mr. Siclari testified that he ordered the Amgen transaction without any recommendation,[135] and without knowing about Hanover's insolvency or impending demise. Once more this Court does not find such testimony credible, and the Court regards it as one more example of testimony on Mr. Siclari's part that defies logic and the objectively verifiable facts. Mr. Siclari's testimony that the Amgen purchase was an ordinary course purchase, and his stated ignorance of difficulties on Hanover's part contrasts with numerous statements by other favored customers who admitted that Hanover brokers told them about portions of Hanover's scheme.[136] The assertion that his lifelong friend Catoggio made no similar statements once more strikes this Court as less than credible. It also strikes the Court that it cannot be a coincidence that in that final week, there were each of the trades for Mr. Siclari's children; the sale of Panax; the purchase of Amgen; and the withdrawal of the $200,000.

Garrity denied the claims on the grounds that (1) the Trustee could cancel the challenged trades under the clearing agreement, and (2) the Trustee could avoid the challenged trades as fraudulent transfers or rescind them as illegal contracts.

127. *See* Trustee Exh. 57; *Ensminger,* 247 B.R. at 87 n. 53.

128. *See* Trustee Exh. 56.

129. *See id.; Ensminger,* 247 B.R. at 87 n. 53.

130. *See* Trustee Exh. 56.

131. *See Ensminger,* 247 B.R. at 72.

132. *See id.* at 72, 87 n. 53.

133. *See id.* at 72.

134. *See id.* at 86–87, and n. 53.

135. *See* Siclari Dep. # 1 Tr. at 95–96.

136. *See* Trustee Exh. 28.

The NASD closed Hanover on February 24, 1995. With that, the demand for House Stocks ceased, and House Stock prices plummeted. Hanover owed Adler approximately $70 million as a result of Hanover's purchase of House Stocks while it was insolvent. This obligation exhausted Adler's reserves, and forced Adler out of business as well. The NYSE directed Adler to cease operating on Sunday, February 26, 1995.[137]

## B.

### Mr. Siclari and Catoggio

Mr. Siclari was a close friend of his broker, Catoggio.[138] Catoggio was also one of Hanover's two traders, and its head trader.[139] Catoggio served as Mr. Siclari's broker throughout the relevant time period,[140] and was one of two Hanover traders responsible for executing trades on behalf of customers.[141]

Catoggio and Mr. Siclari started as childhood friends, and remained close personal friends while Mr. Siclari had an account at Hanover.[142] Mr. Siclari's friendship with Catoggio continued at least until November 1997, a time after the failure of each of Hanover and Adler. At least through that time, they continued "to socialize on a regular basis." [143]

According to his testimony, Mr. Siclari learned of the closing of Hanover on the night of February 25, 1995, when, after he had tried without success to reach Hanover's offices by telephone all day, he called Catoggio at home and was told the news by Catoggio himself.

Close connections between Mr. Siclari and Catoggio continued even after Hanover's close. In December 1995, Mr. Siclari subscribed for 160,000 Class A warrants in a private offering of American Fuel Corp.; Catoggio subscribed for the same number, as did Catoggio's fiancée, Dr. Susan Amico.[144] Catoggio's check covering the subscription price was dated January 17, 1996; Catoggio's fiancée Dr. Amico's check was dated January 19, 1996; and Mr. Siclari's check was dated January 20, 1996.

Mr. Siclari's testimony at trial that it was a sheer coincidence that both he and Catoggio invested in American Fuel Corp, and that he had no idea Catoggio was investing in it, must also be rejected by the Court. Indeed, the Court finds it to be further evidence of a general pattern and practice on the part of Mr. Siclari to conceal his dealings with Catoggio, relevant in determining the extent of his knowledge regarding the activity in his Hanover account, which was handled by

137. *See Ensminger,* 247 B.R. at 73.

138. Findings ¶ 16.

139. *See* 1997 Catoggio Dep. 14–15; NASD Interview of Robert Catoggio, dated May 23, 1995 at 13 ("NASD 1995 Catoggio Interview"); Trustee Exh. 115, Adler 1994 Memo (describing Catoggio as Hanover's head trader); Findings ¶ 19.

140. *See* Siclari Dep. # 1 Tr. at 31.

141. *See* Catoggio SEC Dep. 37; Trustee Exh. 115.

142. Trustee Exh. 100, Siclari Dep. # 1 Tr. at 19–21; *see also* Trustee Exh 161, Siclari Trading Records (listing Catoggio as broker).

143. *See* Findings ¶ 16; Siclari Dep. # 1 Tr. at 21. Mr. Siclari ended his contact with Catoggio in November 2000, complying with a provision in Mr. Siclari's plea agreement pursuant to which Mr. Siclari pleaded guilty to one count of structuring, a violation of the Bank Secrecy Act, 31 U.S.C. § 5324(a)(3). *See* Siclari Exh. 2 (Plea Agreement dated August 3, 2000). Mr. Siclari's plea agreement prohibited him from associating with any person convicted of a felony. *See* Siclari Exh. 3.

144. *See* Trustee Exh. 141.

Catoggio, and to cover up actions by Catoggio, and communications with him, that might reflect badly upon Catoggio individually, or upon the two of them, together.

## C.

### *Catoggio's Regulatory and Legal Infractions*

Catoggio had a lengthy history of accusations by securities industry regulatory authorities and law enforcement personnel with respect to alleged misconduct on his part, and a lesser, but nevertheless material, history of determinations that he was guilty of misconduct or pleas of guilty admitting to such—including with respect to misconduct at Hanover during the time period relevant here, and transactions relevant here:

(1) Following a January 1990 complaint against Catoggio alleging violations of NASD rules for effecting unauthorized transactions in customer accounts and sharing in a customer's account, Catoggio was fined and temporarily suspended; [145]

(2) Following the IPO for House Stock Mr. Jay on February 11, 1993, an NASD investigation of aftermarket trading in Mr. Jay concluded that Hanover "dominated and controlled the market for [Mr. Jay]," and that "[Hanover's] dominant position enabled the firm to manipulate the price of [Mr. Jay stock]." Catoggio was one of the six Hanover officials named in the report. The NASD report stated that it is "clear that Dr. Amico's [Catoggio's fiancée's] account is a conduit for Mr. Catoggio and that Mr. Catoggio had a beneficial interest in the account." The NASD investi-

gation report detailed how gains from trading in Mr. Jay were transferred from Dr. Amico's account to a joint bank account held by Catoggio and Dr. Amico; [146]

(3) On September 21, 1995, following the November 9, 1993 IPO for House Stock All Pro, Catoggio was barred from the securities industry and fined $50,000 by the SEC for his role in manipulating the price of All Pro. The SEC found that while at Hanover, Catoggio engaged in acts of manipulation of the market for All Pro in willful violation of federal securities laws, and, by reporting All Pro trades at false prices, aided and abetted Hanover's securities law violations. The SEC found that Catoggio "bid for All–Pro units, or induced others to bid for those units, while simultaneously conducting a distribution of those units, in willful violation of Exchange Act Rule 10b–6"; [147]

(4) On March 18, 1996, Catoggio was censured, fined $42,000 and barred from the industry for five days by the NASD for effecting the sales of units in an IPO and sharing in the proceeds of the sale of those units, thereby benefiting from trading in the aftermarket at a time when he was restricted from purchasing the IPO stock; [148]

(5) On May 1, 1997, Catoggio was indicted in the United States District Court for the Eastern District of New York for mail and wire fraud, criminal violations of SEC Rule 10b–5 and commercial bribery in connection with a fraudulent scheme to manipulate the market in the securities of First Colonial Ventures, Ltd. On January 26, 1998, in response to that indictment, Catoggio

---

**145.** *See* Trustee Exh. 41, NASD Eagle Vision Order, Bates Nos. NAS 0102–106.

**146.** Findings ¶ 28.

**147.** *Id.* at ¶ 27.

**148.** *Id.* at ¶ 26.

550

pleaded guilty to securities fraud. He stated, in his allocution:

> I conspired with Joseph Dibella [a Hanover broker] to violate the securities law ... by agreeing to manipulate the price of ... a publicly-traded company. The way I did it was by agreeing to pay someone, who I later learned was an F.B.I. Agent, to buy the stock on behalf of his customers. This would create a demand for the stock and artificially inflate the price of the stock. I did this knowingly and willfully, knowing that it would violate the security law.

At the same hearing, Catoggio's attorney stated that Dibella and Catoggio "caused the market price for [the same publicly traded company] to be inflated by market manipulation"; [149]

(6) On May 6, 1997, Catoggio was fined and barred from the industry for his role in manipulating the House Stock Eagle Vision (a stock in which the Trustee does not allege that Mr. Siclari traded or was otherwise involved). The NASD found that Catoggio, along with Hanover's Ronan Garber and Schatzer made numerous misstatements as part of a larger scheme to manipulate the market for the stock. Catoggio was found to have "effected a series of transactions in Eagle Vision, Inc. ("EAGV") ... which created actual and apparent active trading in EAGV or raised the price of EAGV. These actions were taken to induce the purchase and sale of EAGV by others ..."; [150]

(7) In late 1998, Catoggio was indicted in the United States District Court for the Eastern District of New York on securities fraud and money laundering charges. The indictment stated that, although barred from the industry, Catoggio remained in the securities business as a secret control person of several brokerage firms. An account was opened at the brokerage firm that was the primary subject of the indictment "mainly so that the defendant ROBERT CATOGGIO could ensure that JOHN DOE received a share of profits generated by fraudulent trading in TSUN [a security] at [that brokerage firm]." Catoggio and others, it was charged, "were able to fraudulently inflate and maintain the market share price of TSUN," and used nominee accounts as part of a scheme to conceal and disguise the nature, location, source, ownership and control of the proceeds; [151]

(8) On June 16, 1999, Catoggio was indicted once again, in the United States District Court for the Eastern District of New York, for violations of federal securities law, mail and wire fraud, money laundering, conspiracy to commit the same and other crimes, (including perjury, making false statements and obstruction of justice), during his employment at Hanover and other affiliated brokerage firms. The indictment alleged that Catoggio, along with Hanover employee Roy Ageloff, used nominee accounts as part of his fraudulent actions. [152]

While the Court believes that it should disregard matters with respect to which Catoggio was merely accused without a determination or plea of guilt (and has done so), it nevertheless finds, on what it believes to be overwhelming evidence, that Catoggio—Mr. Siclari's broker throughout the relevant period and life-long friend—knew how to, and did, manipulate

149. *Id.* at ¶ 25.

150. *Id.* at ¶ 29.

151. *Id.* at ¶ 24.

152. *Id.* at ¶ 23.

securities markets and use nominee accounts for his own benefit, including the channeling of the proceeds of a market manipulation through the brokerage account of a close associate to his own bank account.[153]

## D.

### Mr. Siclari's Trading Background and Practices

Before the period of his trading with Hanover, Mr. Siclari had no experience in the securities industry. Yet he made his living solely by trading stocks from 1992 until the close of Hanover in 1995.[154] From then on, he no longer made his living in that manner.

Mr. Siclari testified that he had no knowledge regarding the process by which stockbrokers buy and sell stock. Nevertheless, he also testified that he made all final decisions with respect to each and every purchase and sale of stock recorded in his account at Hanover.

Mr. Siclari stated early in his live testimony that he had an understanding with Catoggio that he did not want to be "pitched" or solicited with respect to investments. Later, however, Mr. Siclari agreed with his counsel's statement that "Catoggio gave [Mr. Siclari] lots of interesting investing advice during the time he operated his account." Then, later still, Mr. Siclari maintained, inconsistent with

the previous concession, that he made 96–97% of trades of his own volition, without recommendation from Catoggio.

Attempting to reconcile the inconsistencies, particularly in the context of other essentially undisputed facts, the Court concludes that it cannot be sure whether Catoggio told Mr. Siclari of everything he was doing (and why), or merely the broad outlines, or whether Mr. Siclari simply (but knowingly) let Catoggio use Mr. Siclari's account however Catoggio saw fit (with the understandings that Mr. Siclari would gain, as he plainly did, from Catoggio's actions, and that Mr. Siclari would pass on a percentage of his gains to Catoggio).[155] But the Court necessarily must conclude that it was at least one of these, and that Mr. Siclari's testimony that he personally authorized those trades as if they were ordinary securities transactions cannot be believed.

## E.

### Mr. Siclari's Cash Withdrawals

Throughout the relevant time period, and particularly in 1994 and 1995, Mr. Siclari had a practice of wiring money from his Hanover account to his personal bank account, and when he needed cash, to write out a check to himself (or, in some instances, to "cash") and cash it at his bank.[156] The lack of any information as to

153. Ultimately, the Court has relied on the conclusions of the Trustee's experts, whom it found credible and persuasive, and the Court's reasonable inferences, for its finding that IPOs were manipulated.

154. *See* Findings ¶ 151; Siclari Dep. # 2 Tr. at 357.

155. For reasons discussed in the conclusions of law below, any actual or apparent differences in that degree of knowledge are ultimately not material. As the latter two options

constitute species of recklessness, a type of scienter that does not, at least in this context, have meaningful differences in law from full and complete actual knowledge, and, of course, Mr. Siclari chose to avail himself of the benefits of the wrongful conduct on the part of his agents Catoggio and Hanover.

156. For instance, on November 8, 1994, $30,000 was wired from Mr. Siclari's Hanover account to his bank account. Subsequently, on November 8, 9 and 10, he withdrew almost $29,000 in cash.

where several hundred thousand dollars from Mr. Siclari's Hanover account ultimately went is remarkable.

Mr. Siclari asserts that he never shared any of the funds from his Hanover account with anyone, including Hanover personnel. He contends that he rather used the funds his Hanover account generated to pay for expensive cars,[157] a timeshare in Aruba, home renovations, parties and gifts, and gambling debts. Based on the totality of the evidence, the Court concludes that Mr. Siclari did indeed spend funds on those things, probably substantially, but that his disclaimer of passing funds to Catoggio and/or others is also not credible.

Mr. Siclari testified that he paid cash for most, if not all, of his expenses—hence the wiring of substantial amounts of money from his Hanover account to his bank account, followed by the withdrawal of large sums of cash. From late 1993 to early 1995, Mr. Siclari testified, he lost approximately $100,000 while gambling.[158] He testified that he spent $12,000 a month to cover household expenses. He also stated that he paid $30,000 for the Aruba timeshare and $20,000 on home renovations. He further testified that during "good times" he spent approximately $15,000 on Christmas presents.

He testified in his deposition that he kept approximately $150,000 in cash in his house to cover gambling losses, and because he "like[d] to have money on hand." Mr. Siclari explained that the procedures he had to endure to withdraw substantial sums of money from the bank created too much of a hassle, causing him to keep cash in the house.

Although Mr. Siclari testified, as a general matter, that the funds were expended in the manner described above, when probed about individual withdrawals of substantial amounts of cash, he could not remember specifically where the money went. No written documentation was provided by the alleged recipients of these funds, nor was any testimony on their part presented.

On several occasions, Mr. Siclari made multiple withdrawals on a single day, and on others he made repeated withdrawals within a period of just a few days. They were characterized by a pattern of making withdrawals just under $10,000—a level at which reporting was required under applicable banking law—or making multiple withdrawals so that none would exceed the $10,000 limit.[159] The transac-

---

**157.** Mr. Siclari testified that at one time he owned 7 vehicles, purchased during the relevant period: a Toyota truck ($50,000 bank check); Corvette ($37,000); Corvette ($40,000); Corvette ($20,000); Corvette (trade-in plus $30,000); Mazda; Porsche; and a BMW ($42,000).

**158.** He also stated that he no longer gambles, and was being treated by a psychologist for a gambling addiction.

**159.** See Trustee Exhs. 130 (Mr. Siclari Bank Records) & 131 (Summary of Cash Withdrawals from Mr. Siclari Bank Account). For example, on March 21, 1995, Mr. Siclari made cash withdrawals of $10,000, $9,000 and $6,000. On March 27, 1995, he made two cash withdrawals of $5,000 each. On No-

vember 8, 1994, he made cash withdrawals of $3,000 and $6,460. On December 2, 1994, December 13, 1994, December 15, 1994, December 16, 1994, December 20, 1994, December 22, 1994 and December 23, 1994, Mr. Siclari made similar multiple cash withdrawals. *Id.*

From time to time, however, Mr. Siclari's cash withdrawals did exceed $10,000 in a single transaction. *See* Trustee Exh. 131. For example, on December 30, 1994, he cashed a check made out to himself for $17,000. On January 6, 1995, Mr. Siclari similarly cashed a check made out to himself for $50,000. He also cashed a check made out to himself for $14,000 on April 12, 1995. *Id.*

tions displayed such a conscious purpose of avoiding the disclosure required for cash withdrawals in excess of $10,000 that Mr. Siclari was charged with, and pleaded guilty to, "structuring"—the crime of making cash withdrawals in a manner calculated to circumvent the reporting requirements.

From December 2, 1994 to December 29, 1994, $160,000 was wired out of Mr. Siclari's Hanover brokerage account into his bank account. Mr. Siclari then withdrew $150,000—all except one portion in increments of less than $10,000—on several dates during the period from December 2, 1994 to December 30, 1994. Likewise, on January 5, 1995 and January 10, 1995, Mr. Siclari wired from his Hanover account into his bank account $60,000 and $50,000 respectively. He subsequently withdrew, in two transactions, $50,000 and $2,018, on January 6, 1995. In addition, he withdrew a total of $62,000 from January 9, 1995 to February 21, 1995.

Not coincidently, in the Court's view, cash withdrawals from Mr. Siclari's bank account in the period from November 1994 to February 1995 followed the Play Co. and Panax IPOs, both of which have been determined by this Court to have been manipulated.

The last of the wires from Mr. Siclari's Hanover account took place on February 9, 1995 and February 23, 1995 for $100,000 and $200,000, respectively. Significantly, the $200,000 wire transfer was effected two days before Hanover closed its doors. No other accountholder was able to withdraw money from his account. Mr. Siclari asserted that he withdrew $200,000 because he needed this sum of money on hand in case a property deal in which he had been involved at that time would be consummated. The deal was never consummated.[160]

Taking a more macroeconomic view, in the months following the Play Co. and Panax IPOs, $606,757 was wired out of Mr. Siclari's Hanover account into his bank account, and $502,268 was withdrawn from his bank account, mostly in increments of less than $10,000. No written documentation was put forward showing where these funds ultimately went.

The Trustee contends that significant amounts of all of this cash found their way to Catoggio. While this is not the only possible inference, it is a compelling one, and, as discussed below, Mr. Siclari must show his entitlement to customer status. Assuming, arguendo, that the claimant must make this showing only on a preponderance of the evidence, the Court concludes that Mr. Siclari failed to meet this burden, and concludes, despite Mr. Siclari's denials, that significant sums were transferred to Catoggio. The surrounding circumstances are too compelling. In particular, it defies logic to believe that Catoggio and others would have engaged in so many violations of the federal securities laws without obtaining, in some material way, the benefits of that unlawful activity. The Court agrees with the Trustee's point that it is logical and rational that traders, like Catoggio, who manipulated the securities market for the IPOs in which they made a market, would want to, and did, benefit from that manipulation.

The Court does not find that *none* of the cash that was withdrawn went to gambling, cars, expensive parties and gifts and the like; much of it probably did. But with so many unexplained cash transactions, at times closely proximate to those at which Mr. Siclari made extraordinary gains, the Court is satisfied, and finds, that

160. *See* Siclari Dep. # 2 Tr. at 96–109.

material portions of those cash payments went to Catoggio.

### F.

### Mr. Siclari's Ratification of Hanover and Catoggio Conduct

Plainly Catoggio, Mr. Siclari's long-time friend and broker, was Mr. Siclari's agent in engaging in the transactions discussed above on Mr. Siclari's behalf. So was Hanover. The Court finds that Catoggio and Hanover were Mr. Siclari's agents, effecting the transactions, including the market manipulation that enriched him so, on Mr. Siclari's behalf. The Court finds no less than four separately identifiable reasons for that view, each of which individually compels that result.

First, of course, each of Hanover and Catoggio acted on Mr. Siclari's behalf without any stated limitations and without protest by Mr. Siclari.

Second, the Court further finds that to the extent Mr. Siclari lacked knowledge of specific means or details of the market manipulations by which Catoggio made money for the Siclari account and portions of Mr. Siclari's profits then left Hanover, and Mr. Siclari's account was used to falsify net equity reporting requirements, Mr. Siclari had the state of scienter known as recklessness. Mr. Siclari approved of and ratified the acts taken in connection with his account by Hanover and Catoggio, knew the big picture, and to the extent he did not know details, it was because he knowingly closed his eyes to them. Only willful blindness could have prevented Mr. Siclari from having actual knowledge that the single day massive returns he made in the Hanover IPOs were the result of securities frauds, or that the losses he suffered on 12 separate day-trades (particularly right after substantial sums received on American Toys had come into his account) were not the result of market misfortune, and were instead a means of channeling some of his profits over to Hanover—particularly in light of the less than credible alternative explanations provided with respect to those transactions.

Third, Mr. Siclari went beyond the role of passive beneficiary in ratifying Hanover fraud when he affirmatively—and plainly falsely, in this Court's view—testified to wholly unbelievable stories as alternate means to explain the day-trades and, particularly, the PCNI transactions.

Finally, of course, Mr. Siclari has never renounced the wrongful conduct, and seeks to avail himself of the benefits of it.

### IV.

### Overall Effect of Transactions

The Court believes that each of the following two charts (originally offered by the Trustee, but as modified by the Court for clarification based on its reactions to the evidence) fairly reflects an economic overview of the activity in Mr. Siclari's account.

The first represents a summary of the bottom-line results of the activity in his account:

| | |
|---|---|
| Value of Securities Transferred in, Upon Opening Account as of March 1992 | $ 807,708 |
| Cash Transferred In | $ 15,678 |
| House Stock IPO Gains | $1,057,250 |
| Cash in from Hanover IPO related loans, net of amount lent | $ 494,000 |
| Other Trading Activity (net), of which $665,000 of these losses was in day-trades | ($ 891,930) |
| Cash Withdrawn To Bank Accounts | ($ 827,557) |

| | |
|---|---|
| Ending Account Value as of February 27, 1995 | $ 655,149 |

The second chart (originally offered by the Trustee, but again as modified by the Court for clarification based on its reactions to the evidence) demonstrates the net gain in Mr. Siclari's account:

| | |
|---|---|
| Ending account value, on February 27, 1995 | $655,149 |
| Cash transferred out of account | $827,557 |
| Opening account value, March 1992 plus cash ($15,678) transferred into account | ($823,386) |
| Net Gain | $659,320 |

The Trustee has argued that this table demonstrates that without the benefit of Hanover's IPOs and loan arrangements Mr. Siclari entered into through his account, Mr. Siclari's account would have a substantial debit balance. Indeed, the Trustee has argued that without the benefit of Mr. Siclari's trading in even two Hanover IPOs—Play Co. and Panax—Mr. Siclari's account would have a significant negative account balance.[161] A review of the overall financial picture, as shown in the table, does indeed show exactly that, supporting the Trustee's position that there is nothing for SIPA legitimately to protect, or otherwise to ground a customer claim, even if, as appears to be the case, securities originally deposited by Mr. Siclari in that account, before the Hanover wrongful conduct, were there at the end. The Court so finds. It would be looking at this case with blinders to disregard the massive sums taken from the account and to look at the securities left in the account alone.

## V.

*Facts Relevant to Whether Mr. Siclari's Account Should Be Deemed to Be a "Nominee" Account of Hanover*

Based in considerable part on other factual findings, discussed above and below, the Court makes the following findings relevant to the Trustee's contention that Mr. Siclari's account was a "nominee" account of Hanover:

(a) Mr. Siclari's Hanover account was a beneficial recipient of proceeds from IPO trades conducted with respect to House Stocks whose markets were manipulated by Catoggio and other Hanover brokers in violation of securities laws.

(b) The day-trades conducted in Mr. Siclari's account were rigged to transfer money into Hanover's proprietary accounts.

(c) The PCNI trades had both the purpose and effect of fraudulently increasing Hanover's apparent net capital on January 31, 1995.

(d) Many, if not most, of the transactions in Mr. Siclari's account were done at the direction, and for the benefit, of Hanover.

(e) Trades and other activities conducted in Mr. Siclari's account also had the purpose, and effect, of benefiting Mr. Siclari or others, including Catoggio; Mr. Siclari held the securities in his Hanover account principally for his own benefit.

---

161. Trustee Exh. 56, Siclari Trading History; Norris Decl. # 2, ¶¶ 30–31. However, it also must be viewed in the context of the Trustee's position, which the Trustee's proof has also established, that a very large portion of the trading losses were not the result of normal "win some, lose some" investing, but rather intentionally absorbed losses as a means of money laundering, transferring money to Hanover.

(f) Neither Mr. Siclari nor Hanover had the entire beneficial interest with respect to his account.

## VI.

### Other Factual Findings

Based on the evidence as documented above, and after assessing the credibility of the witnesses at trial, the Court makes the following additional findings of fact:

(a) Hanover employees, like Catoggio, would not manipulate the markets for the House Stocks if they could not reap benefits from such wrongdoing.

(b) Mr. Siclari's account was used by Catoggio to reap such benefits.

(c) Mr. Catoggio and Hanover were agents of Mr. Siclari, with respect to effecting transactions on his behalf.

(d) Mr. Siclari knew of the manner in which his account was being used, and knew that he was passing on part of his profits to Hanover and Catoggio;

(e) To the extent Mr. Siclari did not know all of the details with respect to the foregoing, it was because he intentionally closed his eyes to the details; the Court finds as a fact, or as a mixed question of fact and law, that the factual predicates for a determination of scienter by recklessness have been satisfied.

(f) In testimony in this proceeding in his deposition and at trial, Mr. Siclari went beyond being a passive beneficiary of the wrongful conduct, to affirmatively associate himself with it and protect Catoggio; and

(g) Even in the face of overwhelming evidence of fraud and that he was the beneficiary of fraud, Mr. Siclari continues to seek the fruits of it.

### Conclusions of Law

#### I.

### Preliminary Matters

#### (A)

The Court has subject matter jurisdiction over the objection and the complaint under 28 U.S.C. §§ 1331 and 1334. Following the reference to this Court under Judge Preska's February 27, 1995 order, this is a core proceeding under, *inter alia*, 28 U.S.C. § 157(b)(2)(B) (matters involving claims).

#### (B)

■ A SIPA proceeding is essentially a bankruptcy liquidation designed to achieve the special purposes of SIPA. *See In re A.R. Baron Co.*, 226 B.R. 790. 794 (Bankr. S.D.N.Y.1998) (Beatty, J.) ("*A.R. Baron*"); *Adler I*, 195 B.R. at 269; 15 U.S.C. § 78fff(b) (a liquidation "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code). Congress enacted SIPA in response to the failure of many brokerage houses in 1969–1970. *See In re Stratton Oakmont, Inc.*, 257 B.R. 644, 650 (S.D.N.Y.2001) (Gropper, J.) ("*Stratton Oakmont II*"). The Senate Report with respect to SIPA explained its purposes:

> . . . to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

S.Rep. No. 1218, 91st Cong., 2nd Sess., 4 (1970), quoted in *In re Investors Center, Inc.*, 129 B.R. 339, 341 (Bankr.E.D.N.Y. 1991) (Goetz, J.).

A person whose claim against the debtor qualifies as a "customer claim" receives preferential treatment in the distribution of assets from the debtor's estate. *Adler IV*, 204 B.R. at 114. Claimants with valid "customer claims" share in the fund of "customer property," separate from the general estate, to the extent of the "net equity" in that account. *Id.* Net equity is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor, with all the securities and cash balances valued as of the date of the SIPA proceeding filing. 15 U.S.C. § 78*lll*(11). Congress authorized SIPC to advance funds to the Trustee to pay up to $500,000 to each holder of a valid customer claim, with a maximum of $100,000 for the cash portion of that claim, to the extent the customer's pro rata share of customer property does not fully satisfy the customer's net equity claim. *Adler IV*, 204 B.R. at 114, explaining 15 U.S.C. § 78fff-3(a). SIPC is then subrogated to the customer claims paid to the extent of SIPC's advance, and repayment to SIPC of its advances must be made before payment to general unsecured creditors. *Id.* Claimants not awarded customer status are relegated to sharing in the estate with other general creditors. 15 U.S.C. § 78fff-2(c)(1).

(C)

As a threshold matter, the Court must focus on the allocation of the burden of proof. Mr. Siclari has that burden; it is well-established in the Second Circuit that a claimant bears the burden of proving that he or she is a "customer" under SIPA. *See Ensminger*, 247 B.R. at 73; *A.R. Baron*, 226 B.R. at 795; *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr. S.D.N.Y.1999) (Brozman, C.J.) ("*Stratton Oakmont I*"); *Adler IV*, 204 B.R. at 115. Because the claimant Mr. Siclari seeks preferred status, he is obligated to establish his entitlement to that status. *See A.R. Baron*, 226 B.R. at 795. As Chief Judge Brozman explained in *Stratton Oakmont I*:

> Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code, the Claimants bear the burden of proving that they are the type of priority creditors known as "customers" and that the equity in their accounts is "customer property" under SIPA.

229 B.R. at 278.[162]

II.

*Entitlement to Customer Status*

Under SIPA, "customer" is defined as follows:

> Customer—The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the

---

162. The Trustee notes that there is no authority addressing whether the burden of persuasion for a SIPA claimant is proof by a preponderance of the evidence, or a higher standard.

The Court does not need to decide that issue, because it concludes that even based on a lesser preponderance of the evidence requirement, Mr. Siclari has not met his burden.

debtor for the purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

15 U.S.C. § 78*lll*(2).

However, the caselaw has made clear that fitting within the four corners of that definition does not automatically entitle a claimant to customer status. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir.1974) (rejecting investor-appellant's contention "simply that he falls within the literal definition of a 'customer' in the 1970 statute, and is therefore entitled to its protections"). The Second Circuit went on to note that:

> Judge Learned Hand has vividly admonished us not to be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes.

*Id.; see also Adler IV*, 204 B.R. at 115 ("The term 'customer' is a statutorily defined term of art that is an integral part of a comprehensive statutory scheme governing the rights of creditors and brokers. It is not used in the colloquial sense of 'one who buys or trades' ").

■ When the Trustee raises concerns as to the propriety of customer claim status, the Court necessarily must examine the circumstances under which any cash or securities came to be in the account at the time of the debtor's insolvency, to ensure that customer claim status with respect to such cash or securities is appropriate under SIPA. Relevant, in this regard, are the principles explained in the Second Circuit's decision in *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir.1974) ("*Packer Wilbur*"), and in *Packer Wilbur's* progeny, consistently holding that persons who engage in fraudulent transactions cannot "enjoy the benefits of SIPA." *Id.* at 984–985.

The Second Circuit held in *Packer Wilbur* that providing assistance under SIPA to such individuals "would be a gratuitous, indeed, counterproductive, gesture." *Id.* at 985. Providing relief to a wrongdoer would be particularly inappropriate when "the relief takes the form of public insurance." *Id.* The Second Circuit agreed with an observation of the district court, which was not appealed or challenged, that "only innocent customers can claim the special insurance provided by the Act. . . ." *Id.* at 984.

Later, in *SEC v. Provident Securities Inc.*, 452 F.Supp. 477 (S.D.N.Y.1978), on an appeal from an order of the bankruptcy court that had found *Packer Wilbur* distinguishable, Judge Knapp held that the Second Circuit did not intend to narrowly limit its decision in *Packer Wilbur* to the facts before it in that case. "Rather, it intended to announce a basic public policy that persons who found themselves in the position of claimant's as a result of having violated regulations promulgated pursuant to the Securities and Exchange Act were not intended to be beneficiaries of the public funds established pursuant to S.I.P.A." *Id.* at 477–478.

Acknowledging those cases, Mr. Siclari nevertheless argues that they are distinguishable because they had involved customers who had been active and/or admitted participants in the misconduct that had

deprived them of customer status. He argues they are not applicable to him because, any wrongful conduct was on the part of Catoggio and/or Hanover, and that there was an insufficient showing that he himself did anything wrongful. The Court necessarily must reject that argument, both for its factual premises and as a matter of law.[163]

As a factual matter, or as a mixed question of fact and law, the Court believes that as a consequence of two of the matters that this Court found in its factual findings above, the doctrine of *Packer Wilbur* applies even without considering the extent to which it may be inapplicable to more innocent conduct. The Court has found that Mr. Siclari at least knew generally that he was a beneficiary of wrongful conduct and that to the extent he did not know more details, it was because he closed his eyes to them and had the level

of scienter described in the law as "recklessness." Also, the Court has found that Mr. Siclari was not a mere passive beneficiary of the wrongful conduct, but affirmatively tried, in his testimony, to cover up aspects of the transactions, and protect Catoggio, as he did with respect to his testimony as to the day-trades and the PCNI transaction. Given those findings, the Court does not believe that *Packer Wilbur* would be distinguishable even if it were read to require a fair degree of personal culpability.

However, where, as here, the party seeking customer status is seeking in essence for SIPC and/or the taxpayers to make him whole to recover with respect to an account that plainly was the beneficiary of unlawful conduct,[164] this Court believes that it is no jump at all to conclude that SIPC and the taxpayers need not pay that

---

**163.** This is not a case where SIPC and a trustee, on the one hand, and an innocent investor who was the victim of unauthorized trading, on the other, were jousting over the appropriate relief for the investor and the allocation of the risk of loss occasioned by the debtor's personnel's wrongful conduct. *Compare Investors Center,* 129 B.R. at 353 (distinguishing *Packer Wilbur*); *Stratton Oakmont II,* 257 B.R. at 657 (determining that trustee's proposed relief for customer victims of unauthorized trading was insufficient).

Here, of course, Mr. Siclari has not alleged that he was the victim of unauthorized trading; he has contended exactly the opposite, and the Court has found that he was the knowing beneficiary of transactions that he happily accepted. He was hardly innocent, by any commonly accepted meaning of that word. Moreover, even if the Court were not in a position to make the scienter findings it made, it would still be faced with the fact that Mr. Siclari's claim was for the fruits of illegal activity, much more serious than the margin violations found to disqualify investors from customer status in *Packer Wilbur* and *Provident Securities,* or the comparatively modest culpability of the investors in *Ensminger* and *Jackson.*

**164.** The Court is not persuaded by Mr. Siclari's argument that a different rule should apply because the assets remaining in his account are for the most part securities that he contributed to his account before the conduct of which the Trustee complains. With an exception not relevant here (relating to customer name securities, *i.e.,* registered in the customer's name which were held for the customer's account by the broker, *see* 15 U.S.C. §§ 78lll(4) and 78fff-2(c)(2)), SIPA protects accounts—*i.e.,* the net equity in customer accounts—in contrast to particular securities. *See* 15 U.S.C. § 78fff-3. Even assuming, without deciding, that the net equity in a customer account could be computed by mechanically taking a "snapshot," akin to balance sheet, without looking at the individual transactions in that account (including profits from fraud and cash withdrawals of the profits), it is clear, in this Court's view, that whether an account qualifies for SIPA protection in the first place is determined differently, and is informed by different concerns, in each case as articulated in *Packer Wilbur* and *Provident Securities.*

price, and that customer status is inappropriate under such facts.

■ Firstly, that may already be the teaching of *Provident Securities* alone. There Judge Knapp specifically rejected the wife's argument that she was entitled to SIPA protection because she did not participate in the securities violations. He found her lack of participation irrelevant— "Either she is a nominee and the funds are really those of her husband, or she is a donee, not a bona fide purchaser, in which she should stand in the same shoes as the donor [her husband]." *Provident Securities*, 452 F.Supp. at 478 n. 3. *Provident Securities* suggests, and indeed fairly can be read to hold, that one who holds title to assets that are the fruits of unlawful activities can be denied recovery under SIPA, even if the holder of those assets is merely the beneficiary of the wrongful conduct, and not the principal wrongdoer.

■ Secondly, as this Court has found as a fact, Catoggio and Hanover were Mr. Siclari's agents effecting the transactions, including the market manipulation that enriched him so. The wrongful conduct on the part of each of them is imputed to Mr. Siclari by virtue of their principal-agent relationship. *See Ensminger*, 247 B.R. at 96–101. The fraud committed by Catoggio and Hanover took place while acting within the scope of their authority to act on Mr. Siclari's behalf. As a general rule, "[a] principal is liable for the frauds and misrepresentations of his agent within the scope of the authority or employment of the agent, even though he had no knowledge thereof and intended no fraud." *Ensminger*, 247 B.R. at 96 (quoting 3 N.Y.Jur.2d AGENCY AND INDEPENDENT CONTRACTORS § 256 (1980) (footnotes omitted)).

■ That is particularly so where, as here, Mr. Siclari is seeking to avail himself of the benefits of the agents' fraud. "Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge." *Id.* at 98 (citing *Angerosa v. White Co.*, 248 A.D. 425, 428, 290 N.Y.S. 204 (4th Dep't 1936), *aff'd* 275 N.Y. 524, 11 N.E.2d 325 (1937) ("A principal who gives his agent authority to solicit a sale and accepts the fruits of his efforts will be held responsible for the fraudulent as well as the fair means by which the contract was obtained, if such instrumentalities are in line with the accomplishment of the object of the agency")). As Judge Garrity noted in *Ensminger*, 247 B.R. at 99, "[t]he rule in New York is that if a principal authorizes a transaction and its agent commits a fraud while effecting that transaction, the principal cannot enforce the transaction against the defrauded party, even if the principal did not authorize the fraud itself."

In this Court's view, any uncertainties as to Mr. Siclari's ability to divorce himself from his agents' fraud that may have existed at the time of the trial and post-trial briefing of this matter no longer exist after Judge Marrero's decision in *Jackson*. In reviewing Judge Garrity's determination in *Ensminger*, Judge Marrero necessarily had to consider what "innocence" means in the context of people who did not themselves attempt to defraud Adler or SIPC, or the creditors of either of them, but who wished to accept the benefits of such fraudulent transactions—and, worse yet, receive recovery under SIPA for the stock and cash positions thereby obtained.

Judge Marrero noted that the Hanover personnel had engaged in transactions as the customers' agents, and that the appellant customers had benefited from those transactions whether or not they had expressly authorized the Hanover personnel so to act—or if, when asked, any of those

customers could have truthfully said "I never told them to violate the law." He noted, in this connection, that the *Jackson* appellants' purchases and sales "were no less tainted by deceit than the rest of Hanover's fraudulent transactions." *Jackson*, 263 B.R. at 460. The prices Hanover charged them for the purchase of their House Stocks "were no less manipulated." *Id.*

While the particular manipulated buy and sell prices here and in *Jackson* had an overlap that is modest at best, and for the most part related to different times in the Hanover history, the manipulated prices in both cases were nevertheless common components of a continuous stream of wrongful conduct—"Hanover's fraudulent continuum," *id.*—that would not easily be capable of separation, even if such separation had any useful purpose. The fact is that in each of this case and *Jackson*, the customer found it to his or her advantage to argue that the wrongful conduct was Hanover's and not the customer's, and to ask for customer status as if the trades were legitimate.

In *Jackson*, Judge Marrero quoted from a decision of the Fourth Circuit Court of Appeals that has quite a remarkable similarity to Mr. Siclari's position in this case:

> The principal cannot claim the fruits of the agent's acts and still repudiate what the agent knew.... Defendant, by his own admissions, could not have been less interested in [the details of the transaction]. He was interested only in obtaining the profit ... and he was perfectly content to leave the details as to how he obtained it to [his agent].

*Id.* (quoting *Eitel v. Schmidlapp*, 459 F.2d 609, 615 (4th Cir.1972)) (brackets and ellipsis in *Jackson*). It is hardly surprising

that Judge Marrero regarded such authority as persuasive in attributing the agent's wrongful conduct to the customer, at least for the purpose of denying the customer the fruits of the unlawful conduct.[165] Speaking of *Eitel* and other cases he also addressed, Judge Marrero synthesized them:

> The point that emerges from these cases is that what matters in response to a claim of innocence is not so much what the claimants actually knew or intended. Rather, it is that, *whatever their good faith, insofar as the claimants sought to avail themselves of the benefits of an agent's comprehensive fraudulent scheme,* they cannot cleanly extract their own gems out of the mire.

*Id.* at 462 (emphasis added).

Judge Marrero further noted that equitable principles and priorities under the Bankruptcy Code and SIPA sought to prevent unjust enrichment and to avoid placing some claims unfairly ahead of others "by distinguishing transactions truly entered in good faith and for value from those somehow induced and tainted by preference, illegality or fraud." *Id.* Relevant to this, he noted the observation of Judge Goetz in *Investors Center:*

> Repeatedly this Court has been forced to tell claimants that the fund created for the protection of customers of honest, but insolvent, brokers gives them no protection when the insolvent broker has been guilty of dishonesty, breach of contract or fraud.

*Id.* at 463 (quoting *Investors Center*, 129 B.R. at 353). In observations equally applicable to Mr. Siclari, Judge Marrero regarded it as essential to consider whether the *Jackson* customers should have priori-

---

**165.** It will be recalled, of course, that the Trustee is not seeking to recover damages from the customer-principal for the wrongful activity, but merely to avoid payment to the customer-principal under SIPA for the fruits of the agent's unlawful conduct.

ty over those "who did not engage unethical agents, and cannot seek to avail themselves of advantages and bargains created for them by fraudulent misdeeds...." *Id.* at 464. He noted that their "invocation of innocence is a relative thing and their claims for relief must be assessed in these relative terms." *Id.*

In early introductory remarks to his lengthy decision in *Jackson*, Judge Marrero made a number of comments which, while directed at beneficiaries of other wrongful conduct (who, ironically, were considerably more innocent than this Court has found Mr. Siclari to be), nevertheless have considerable relevance here. Judge Marrero stated:

[A]s is frequently the case even in connection with the most passionate incantations of the term, there is often more to innocence than meets the eye. Profoundly held convictions of one's own clean hands at times play tricks of the mind, blurring objectivity, concealing from comprehension or view the person's actual role in unavowed causes and effects, and impeding discernment of shades of involvement and responsibility not immediately apparent to the naked or subjective eye.

*Id.* at 416. He continued:

And, beyond a person's own actions, whether the given conduct is individually or externally controlled, circumstances may prevail under which the law, in disregard of the innocent's protestations, and indeed at times even conceding whatever validity due them, may still impose liability, not on account of anything the person may have done or omitted to do, but, for reasons of equity or policy, by imputing to the apparent bystander the misconduct of a sufficiently related wrongdoer. By these means, the law recognizes that even innocent associations with scoundrels has its limitations, and its costs. Occasions arise when the villain chooses to exploit the relationship and betray the trust, and then the supposed "innocent" may be obligated to pay a price.

*Id.* at 416–417.[166]

This Court fully agrees with Judge Marrero's analysis of "innocence" in this context. Even assuming, arguendo, that Mr. Siclari were a wholly unknowing beneficiary of the succession of fraudulent transactions that caused him to profit so handsomely, this case would likewise present "circumstances ... under which the law ... may still impose liability ... for reasons of equity or policy, by imputing to the apparent bystander the misconduct of a sufficiently related wrongdoer." *Id.* at 416.

SIPA's policy would be undermined if Mr. Siclari's claim for his account balance—which had been augmented by one fraudulent transaction after another (net of the cash withdrawals and structured losses, with the effect of passing some of that augmentation on to others), and represented the fruits of the massive fraud perpetrated (as Mr. Siclari concedes it was) by Catoggio and Hanover—were nevertheless subsidized under SIPA. Though Mr. Siclari's scienter was satisfactorily proven, it need not have been to deprive him of customer status. His relationship to Catoggio and the unique treatment of

---

166. Likewise, near the end of his opinion, Judge Marrero made another relevant observation:

Rewarding parties who seek to avail themselves of the fruits of their agents' fraud would serve to advance no stated public policy expressed or implied in [the federal securities laws] or articulated by any tenet of common sense.

*Id.* at 494 (bracketed language added in substitution).

his account gave Mr. Siclari huge benefits for the duration of Hanover's existence. Having received that, he cannot claim customer status.

### III.

### Equitable Subordination

■■■ If a customer's claim is denied "customer claim" status under SIPA, that does not mean that it is disqualified from allowance as a general unsecured claim, *pari passu* with other unsecured claims. However, the Trustee additionally seeks further relief, subordinating Mr. Siclari's claim to the claims of unsecured creditors as well.

■■■ The equitable subordination doctrine, codified in part in Section 510(c) of the Bankruptcy Code,[167] is limited to reordering priorities; it does not permit disallowance of claims. *See 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 836–837 (Bankr.S.D.N.Y.1994) (Bernstein, C.J.) (*"80 Nassau Associates"*). The doctrine empowers the bankruptcy court to consider whether "notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit the claimant to share pro rata with the other claimants of equal status." *Id.* at 837 (quoting Andrew DeNatale & Prudence B. Abram, *The Doc-*

*trine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law. 417, 419 (1985) ("DeNatale & Abram")).

■■■ In this district, as most, bankruptcy courts analyzing the doctrine of equitable subordination start with the Fifth Circuit's decision in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977) (*"Mobile Steel"*). *Mobile Steel* laid out a three-prong test for determining whether equitable subordination is appropriate.[168] Under this test, the court must consider whether (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is consistent with bankruptcy law. *See Mobile Steel*, 563 F.2d at 700; *80 Nassau Associates*, 169 B.R. at 837; *ABF Capital Management v. Kidder, Peabody & Co. (In re Granite Partners)*, 210 B.R. 508, 514 (Bankr.S.D.N.Y.1997) (Bernstein, C.J.) (*"Granite Partners"*).

■■■ As Judge Bernstein noted in *80 Nassau Associates*, inequitable conduct is not limited to fraud, but includes even lawful conduct that shocks one's good conscience:

> Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, *inter alia*, a

---

**167.** Section 510(c) provides in relevant part:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .

**168.** The Code expressly grants a bankruptcy court authority to equitably subordinate a claim, but does not set forth the standard to

be used in determining if and when equitable subordination is appropriate. The development of the doctrine has been left to the courts, as Congress intended. *See DeNatale & Abram*, 40 Bus.Law. at 421. The three-prong test set forth by *Mobile Steel*, a pre-Code case, "has been widely adopted by courts as the proper test for equitable subordination under 510(c)." *Herzog v. Leighton Holdings (In re Kids Creek Partners, L.P.)*, 200 B.R. 996, 1014 (Bankr.N.D.Ill.1996), *aff'd*, 239 B.R. 497 (N.D.Ill.1999).

secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.

*80 Nassau Associates,* 169 B.R. at 837 (citing *In re Tampa Chain Co.,* 53 B.R. 772, 779 (Bankr.S.D.N.Y.1985)), quoting in turn *In re Harvest Milling Co.,* 221 F.Supp. 836, 838 (D.Or.1963). In this case the fact that inequitable conduct may be lawful is of lesser importance, however, because in many respects here the conduct in question is indeed, criminal.

■ Thus, to equitably subordinate Mr. Siclari's claim, the Trustee must prove (1) inequitable conduct, (2) that caused (a) injury to Adler's creditors or (b) unfair advantage to Mr. Siclari's account, and (3) equitable subordination of the claim must be consistent with bankruptcy law. See *Mishkin v. Siclari,* No. 98–9432A (JLG), slip op. at 15 (Bankr.S.D.N.Y. May 27, 1999); *Mobile Steel,* 563 F.2d at 700. This test is applicable whether the claim to be subordinated is that of an insider, as in *Mobile Steel,* or a non-insider. See *Granite Partners,* 210 B.R. at 514–515 (denying motion to dismiss equitable subordination claim filed against dealer who sold debtors (three hedge funds) complex securities). Where the claimant is an insider, however, his dealings "are subjected to rigorous scrutiny" and the burden is on him "to prove the good faith of the transaction" and also "to show its inherent fairness from the viewpoint" of the debtor. *Mobile Steel,* 563 F.2d at 701 (quoting *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the progenitor of equitable subordination doctrine).

Although traditionally the equitable subordination doctrine was applied to subordinate only insider claims, it now may be applied to subordinate non-insider claims as well. See *80 Nassau Associates,* 169 B.R. at 838. Thus, assuming that Mr. Siclari should not be treated as an insider, equitable subordination of his claim may nevertheless be imposed. Here, however, the Trustee argues that Mr. Siclari should be deemed to be an insider.[169] The Court agrees, and so finds, as a mixed question of fact and law. "Insider" is defined in Bankruptcy Code section 101(31). That section provides that:

"[I]nsider" *includes—*

(B) if the debtor is a corporation, a:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor . . . .

(Emphasis added).

■ Significantly, the term "includes" that precedes that list is not limiting. See Bankruptcy Code section 102(3). The Court is not limited to that list, and may consider whether one is an insider based on the totality of the circumstances. See *Hirsch v. Tarricone (In re A. Tarricone, Inc.),* No. 99–5322A, slip op. at 8–9 (Bankr.S.D.N.Y. March 14, 2002) (Hardin, J.) (publication pending) (*"Tarricone"*) ("The statutory list is not exhaustive and it is for the courts to define the limits of non-statutory insider status"). The analysis is a fact intensive one, which is done on a case-by-case basis. See *id.* at 10; 2 Lawrence P. King et al., *Collier on Bank-*

---

**169.** Trustee Post–Trial Points & Authorities at 5–6.

*ruptcy* ¶ 101.31 (15th ed. rev.2001) ("An 'insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny.... Whether or not an individual or entity will qualify as an insider is a question of fact").[170]

In *Tarricone,* Judge Hardin of this Court considered, in the context of a preference action (and the longer window of time during which preferences in favor of insiders are subject to attack) whether a friend and close acquaintance of the debtor's principal should be deemed to be an insider. Based on the totality of the facts, Judge Hardin concluded that the friend should be. Judge Hardin there noted that in determining whether a person is a non-statutory insider, courts have generally focused on two basic factors: (1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. *Tarricone* at 9. He noted, in that connection, that courts had held that creditors with no direct relationship with the debtor (other than as creditor) could nevertheless be deemed to be statutory insiders "by virtue of their close personal relationship with persons who are statutory insiders." *Id.* at 11 (citations omitted). "In such cases the affinity with an insider is the explanation for the non-arm's length, preferred relationship between the creditor and the debtor." *Id.*

Though the context in which Judge Hardin analyzed whether the person in question was an insider was of a preference action, this Court believes the statutory and caselaw analysis to be no different here. As in *Tarricone,* this Court looks to consider, in determining whether Mr. Siclari has insider status, whether he had a similar "close, personal relationship" with a statutory insider, and whether the facts evidence that his transactions with Hanover were "not at arm's length." *Id.* at 15.

Here Mr. Siclari's friendship with insider Catoggio was a classic example of the requisite "close, personal relationship," and the Court has found that many, if not most, of the transactions in Mr. Siclari's account were done for the collective benefit of Mr. Siclari and Hanover. Mr. Siclari's account was so operated by Catoggio—Mr. Siclari's close friend, Hanover's head trader, and one of two people who ran Hanover Sterling. Mr. Siclari benefited from the fraud at Hanover in ways not materially different from the ways an insider would, and his relationship with Hanover was anything but arms-length; he obtained, in the form of access, opportunities and favored treatment, many of the benefits one normally associates with insiders. As the Trustee has noted, no customer of Hanover benefited from Hanover's fraud as much as Mr. Siclari did. Plainly Mr. Siclari is one whose close relationship with Catoggio—and thus Hanover—subjects any transactions made between Hanover and Mr. Siclari to "heavy scrutiny." The Court thus finds as a fact, or mixed question of fact and law, that Mr. Siclari was an insider.

 However, as noted above, the doctrine of equitable subordination also is applicable with respect to the claims of persons or entities who are not insiders. Even assuming that Mr. Siclari were no more than an "outsider" with special access and privileges, he would still be sub-

---

170. Because Mr. Siclari's claim arose as a consequence of his dealings with Hanover, for whom the debtor Adler had to suffer the financial consequences, the Court does not believe it necessary or appropriate to absolve Mr. Siclari from insider status because it is Adler, and not Hanover, that is the debtor in this SIPA case.

ject to equitable subordination. The doctrine of equitable subordination has been applied against non-insiders with care, because it has the potential to be subject to abuse, and to be used as a means for reordering normal bankruptcy priorities; it is not unheard of for parties, advancing their own needs and concerns with respect to enterprises of limited value, to try to use equitable subordination as a sword against creditors who dealt at arms length with a debtor, and some of those claims have merit and some do not. Where, however, the issue is whether Mr. Siclari should share *pari passu* with other creditors when the effect of such is to benefit from unquestioned and, indeed, criminal fraud, those concerns are not relevant here.

In *80 Nassau Associates*, Judge Bernstein noted:

The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not ... be specifically related to the creditor's claim, either in its origin or it's acquisition, but it may equally arise out of *any unfair act* on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate....

169 B.R. at 838 (emphasis added). The issue, then, is whether Mr. Siclari, personally or through his agents, engaged in the requisite unfair act, and/or whether the circumstances associated with his claim make it inequitable for that claim to share *pari passu* with other unsecured creditors.[171]

For reasons that are apparent from the discussion in the preceding section, the answer plainly is yes. The Court has found that Mr. Siclari's account came to be of the size for which he seeks compensation—even after withdrawal of about as much as he put in—because the account was the beneficiary of market manipulation; that Mr. Siclari willingly suffered losses to channel part of his gains to Hanover; and that Mr. Siclari knowingly allowed his account to be used to create sham appearances of net available capital to, in essence, defraud the NASD. Mr. Siclari benefited handsomely from the acts of his agents in this regard, and not only did he not disclaim the acts of his agents; he sought to avail himself of the benefits of the acts his agents had taken. Permitting Mr. Siclari to share *pari passu* with the claims of innocent holders of unsecured claims, when his claim is of the size it is only as a consequence of the fraud, would be extraordinarily inequitable. Here we have both unfair acts engaged in by and on behalf of Mr. Siclari, and circumstances where the wrongful conduct "affects the bankruptcy results to other creditors and so makes it inequitable that he [Mr. Siclari, the beneficiary of that wrongful conduct] should assert a parity with them in the distribution of the estate...." *Mobile Steel*, 563 F.2d at 700.

The conduct in connection with Mr. Siclari's account plainly included "fraud, illegality or breach of fiduciary duty," *Granite Partners*, 210 B.R. at 514; indeed, it included all three of them. The conduct did not involve close questions of candor or disclosure, or issues as to whether a creditor acted overly aggressively in enforcing its perceived rights. Rather, it was conduct that shocked the conscience of the Court, and included, among any number of other things, "secret ... fraud ... an

---

**171.** While a similar analysis might be relevant to whether Mr. Siclari should share *pari passu* with others having customer claim status, the Court need not reach that issue in light of its determination above that Mr. Siclari is not eligible for customer claim treatment.

unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss...." *See 80 Nassau Associates,* 169 B.R. at 837. It was brought about by the "unconscionable, unjust, unfair, close or double dealing or foul conduct" of Catoggio and others for Mr. Siclari's benefit, and, in many respects, of Mr. Siclari himself. *See id.*[172]

The other requirements under *Mobile Steel* require lesser mention. The wrongful conduct did indeed prejudice other creditors, as, most significantly and obviously, it inflated Mr. Siclari's claim relative to their own honest claims, in a situation where the Trustee necessarily had to satisfy creditor claims out of a limited pot. Also, one of the several wrongful acts here, the falsification of net capital reporting, had a particularly prejudicial effect, as it undercut a safeguard for the protection of investor creditors and entities dealing with Hanover (such as Adler), and deprived regulatory bodies of the early warning of difficulties in brokers' satisfaction of their obligations, as the regulatory scheme contemplated. The final factor, consistency

with bankruptcy policy, is of only modest significance here, but plainly does not undercut equitable subordination. It is hardly inconsistent with bankruptcy policy to deny creditors equal status as a response to actions taken on their behalf to give them an unfair advantage.

The Trustee's request that Mr. Siclari's claim be equitably subordinated to claims of general unsecured creditors is granted.

### IV.

#### Claim Disallowance as Hanover Nominee

17 C.F.R. § 300.101(b) states:

> An account held with a member by an agent or nominee for another person as a principal or beneficial owner shall, except as otherwise provided in these rules, be deemed to be an individual account of such principal or beneficial owner.[173]

Based in part on the realities of Mr. Siclari's relationship with Hanover, and in part on this regulation, the Trustee argues that Mr. Siclari's account should be

---

**172.** The Court did not find Mr. Siclari's account credible when he testified that he personally authorized each and every transaction that was effected through his account, but the Court agrees with the Trustee that if Mr. Siclari did, he is guilty of fraud. However, the Court is more inclined to make the determination based on the findings it did make—that Hanover personnel (and Catoggio in particular) made the most important decisions with respect to Mr. Siclari's account with Mr. Siclari's knowledge, acquiescence, and ratification. The discussion above of responsibility under agency law, and in particular its applicability to this case, as explained by Judge Marrero in *Jackson,* is equally applicable here. Equitable subordination is also appropriate on the separate basis that Mr. Siclari aided and abetted the primary fraud conducted by Catoggio and others at Hanover, with knowledge or in reckless disregard of the primary violations, and provided substantial assistance (in the form of putting up capital;

willingness to accept losses and pass part of his funds to Hanover and Catoggio; and to say that he himself authorized the transactions). *See ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308, 1328 (S.D.N.Y.1997) (Sweet, D.J.) ("To state a claim for aiding and abetting a common law fraud, a plaintiff must allege: (1) the existence of the primary fraud; (2) the aider and abettor's knowledge of the fraud; and (3) substantial assistance by the aider and abettor").

**173.** Putting it in context, by inserting the applicable party names here:

> An account held with a member [Adler] by an agent or nominee [Mr. Siclari] for another person [Hanover] as a principal or beneficial owner shall, except as otherwise provided in these rules, be deemed to be an individual account of such principal or beneficial owner [Hanover].

deemed to be a nominee account of Hanover, and, as a result, subject to the treatment to which Hanover would receive as a creditor of the Adler estate—most significantly, as subject to setoff by the $20 million judgment which Adler holds against Hanover.[174] The Trustee contends that this should be so because Hanover was the beneficial owner of the account, and that trades and other activities conducted in the account were done at the direction, and for the benefit, of Hanover. The Trustee argues further that this is a factual inquiry that turns not on Mr. Siclari's knowledge of the illegal activity that his account facilitated, but on the nature and economic reality of that activity.[175]

■ The Court agrees with the Trustee that whether or not Mr. Siclari should be deemed to be Hanover's nominee is a factual inquiry that is driven by the nature and economic reality of the relationship, rather than Mr. Siclari's knowledge of the illegal activity. And the Court has found that many, if not most, of the trades and other activities in Mr. Siclari's account were done at the direction of Hanover, and in no small part for its benefit. However, the "nature and economic reality of the relationship" also includes the fact that the trades were for the *joint* benefit of Mr. Siclari and Hanover, and that Hanover was in substance a *joint* beneficial owner of Mr. Siclari's account, and not a beneficial owner to the exclusion of Mr. Siclari. Putting it another way, while numerous transactions in Mr. Siclari's account were for the benefit of Hanover (e.g. the day-trade losses and the PCNI wash sales), numerous other transactions benefited Mr. Siclari and/or others,[176] and Mr. Siclari held the securities in his Hanover account principally for *his own benefit.*

Thus, because the Court has found as a fact that *each* of Mr. Siclari and Hanover was in part a beneficial owner, the Court must consider whether one (Mr. Siclari) should be deemed the nominee of another (Hanover) when the other (Hanover) is not the only beneficial owner, and the nominee (Mr. Siclari) retains a significant, and perhaps predominant, interest in the account as well.

There is a double entendre here that tends to confuse the analysis. "Nominee" in its most common usage means one who holds property of record for another, and who acts at the direction of another, with the other having *the entire beneficial interest.*[177] "Nominee" also is not uncommonly used to refer to one who acts as a straw man or "front," under the control of

---

174. In addition, the Trustee argues that Mr. Siclari has no standing to pursue customer status under the plain language of the statute. A "customer" under SIPA is limited to one that

> has a claim on account of securities received, acquired, or held by the debtor in the *ordinary course of its business* as a broker or dealer from or for the securities accounts of such person . . .

15 U.S.C. § 78*lll*(2) (emphasis added). The Trustee argues that if the assets in Mr. Siclari's account were obtained through fraud and securities law violations, they could not have been "received, acquired or held in the *ordinary course of business."* Because the Court has already found that Mr. Siclari is not entitled to customer claim status, the Court does not need to determine whether or not the Trustee is also right on this additional ground.

175. Trustee Post–Trial Points and Authorities at 1–2.

176. The most obvious of "the others" was Catoggio, as the Court has found that at least some of the cash withdrawals from Mr. Siclari's account found their way to Catoggio.

177. *See Black's Law Dictionary* 1050 (6th ed.1990), offering, in connection with the definition of "nominee" in the non-political sense, "[o]ne designated to act for another in his or her place"; "[a] form of securities registration widely used by institutional investors to avoid onerous requirements of establishing the right of registration by a fiducia-

another and for the benefit of another, even if for his or her own benefit as well—as a kind of undisclosed agent to perpetrate fraud and/or to facilitate self-dealing.[178] When the NASD accused Catoggio of using nominees, and Catoggio pleaded guilty to the use of nominees, the Court understood that usage of "nominee" to be in the latter sense. That is closer to the context in which the Trustee has used it here, or at least is more consistent with the proof and this Court's factual findings.

The Court has no doubt whatever that Mr. Siclari was Hanover's nominee in the

latter sense—*i.e.,* that his account was used "as part of a scheme to conceal and disguise the nature, location, source, ownership and control of [account] proceeds."[179] Mr. Siclari's account was controlled by Hanover, and used in material respects for Hanover's benefit, even in ways that were to Mr. Siclari's detriment. This Court likewise has no doubt that Mr. Siclari's account was used to perpetrate Hanover's fraud and self-dealing in the respects argued by the Trustee, and in other respects as well.[180] However, the Court does not believe that Mr. Siclari was Hanover's nominee in the former sense, as

ry"; and "[o]ne designated to act for another as his representative in a rather limited sense; *e.g.* stock held by brokerage firm in street name to facilitate transactions *even though customer is actual owner of securities.*" (Emphasis added).

*Black's* goes on to say that "nominee" "is used sometimes to signify an agent or trustee," but goes on to say that:

It has no connotation, however, other than that of acting for another, in representation of another, or as the grantee of another. *Id., citing Schuh Trading Co. v. Commissioner of Internal Revenue,* 95 F.2d 404, 411 (7th Cir.1938). However, this Court is uncomfortable in relying on the broad language in *Schuh Trading,* as applying it to the facts here would in essence be taking the language out of context. In *Schuh Trading,* a tax case dealing with whether gain would need to be recognized in a transaction that might qualify as a corporate reorganization, a contract provided that the assets of a business would be sold to McKesson & Robbins "or its nominee," and the assets were in fact conveyed to the nominee in satisfaction of the obligations under the contract. As the nominee held the entirety of McKesson's interest, the Seventh Circuit had no occasion to focus on the distinction here, and its analysis would have been no different if a tighter definition of "nominee" had been used.

**178.** *See Black's* 1421, definition of "straw man": "[a] 'front'; a third party who is put up in name only to take part in a transaction. Nominal party to a transaction; one who acts as an agent for another for the purpose of taking title to real property and executing

whatever documents and instruments the principal may direct respecting the property. Person who purchases property for another to conceal identity of real purchaser, or to accomplish some other purpose otherwise not allowed."

**179.** This is, of course, the language from one of the indictments against Catoggio; *see* page 57 above.

**180.** Matters identified by the Trustee as constituting evidentiary premises upon which he contended that Mr. Siclari was Hanover's nominee were consistent with, and supportive of, the usage of "nominee" in the latter sense—showings that (1) Mr. Siclari's account financed Hanover IPOs by extending credit to Hanover, when no other "customer" account did so; (2) Mr. Siclari's account financed a House Stock issuer (American Toys) to facilitate its IPO, when no other "customer" account did so; and (3) Mr. Siclari's account was used to transfer cash to Hanover (through rigged day-trades) and to pump up Hanover's balance sheet at critical periods. While they all evidence the manner in which Mr. Siclari's account was used (and that he willingly allowed his account to be so used), the first two factors do not undercut at all, and the third undercuts only slightly, the point that he was as much or more of a beneficiary of those acts as Hanover was

A fourth matter so identified by the Trustee was based on the fact that Hanover's House Stock IPO's were the result of manipulation. Noting that Hanover itself was not lawfully entitled to benefit from after-mar-

570

Mr. Siclari retained a meaningful, and, indeed, the principal, beneficial interest for his own benefit.

Because Mr. Siclari allowed his account to be used to perpetuate fraud, and allowed himself to be used as a straw man (the use of "nominee" in the second sense), the Trustee asks the Court to rule that Mr. Siclari's account is in fact an account of Hanover (the use of "nominee" in the first sense), and should be subject to the Trustee's substantial counterclaim against Hanover. But it is necessary, in this Court's view, to focus on the distinction between the two usages of "nominee" where, as here, the alleged nominee retains a substantial economic interest in his own right. The language in SIPA [181] and caselaw [182] cited by the Trustee to get to the position the Trustee asks this Court to take, which language does not focus on the

ket sales in IPOs it underwrote—the principal profit opportunity under such circumstances—the Trustee pointed out (and the Court has made factual findings consistent with the Trustee's position in this regard) that no account benefited more from the after-market sales in Play Co. and Panax than did the account held in Mr. Siclari's name. The Trustee argued in substance that Mr. Siclari was thus the recipient of the profit opportunity himself, at least in the first instance. But while this further supports the view that Mr. Siclari was a "nominee" in the sense that he was used as a straw man or front to facilitate fraud, it does not support the view that he simply held his account for Hanover's benefit. While it is true that Mr. Siclari benefited handsomely from the manipulation and passed at least some of the profits on to Hanover, there is no indication that he passed on all of them, or a majority of them.

181. The SIPA language quoted at the outset of this discussion plainly would apply to a true nominee arrangement, where a person or entity holds securities at a brokerage firm wholly for the beneficial ownership of another, and understandably so—for otherwise recoveries would go to the wrong people. But it is silent as to whether it applies when the record holder holds the account only in part for the benefit of the other, and also retains a material interest for his, her or its own benefit. If it were intended to be stretched to also cover situations where the account was unlawfully used to benefit another—and to make the record holder subject to defenses that would apply to another—there would be many available ways to say that directly, and the Trustee and SIPC—both of whom have demonstrated expertise in this area—would undoubtedly know of any legislative history or judicial pronouncements dictating a conclusion of that type.

In this connection, the Court is mindful of the Second Circuit's observation in *F.O. Baroff Co., supra*, cited by the Trustee in connection with his *Packer Wilbur* point. Rejecting a contention of an investor "simply that he falls within the literal definition of a 'customer' in the 1970 statute, and is therefore entitled to its protections," the Second Circuit there stated:
Judge Learned Hand has vividly admonished us not to be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes.
*F.O. Baroff*, 497 F.2d at 282.

182. In *SEC v. First City Financial Corp., Ltd.*, 688 F.Supp. 705 (D.D.C.1988), *aff'd* 890 F.2d 1215 (D.C.Cir.1989), the court interpreted the meaning of "beneficial ownership" as it is used in Section 13(d) of the Securities Exchange Act and SEC Rule 13d–3 promulgated thereunder—Williams Act provisions which generally require a variety of disclosures in connection with the acquisition of more than 5% of a class of a corporation's equity securities, which take into account that people or entities may act in concert or in groups, or with contracts, arrangements or understandings, with respect to possible corporate takeovers or changes of corporate control. The *First City Financial Corp.* ruling can easily be understood in the context of the rationale for the statutory provision and related rule there to be construed and enforced, which the Trustee candidly included in his discussion: "it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practicable matter, to influence the use of that power." Id. at 721.

distinction, fails to justify the jump to treat Mr. Siclari's account as an alter ego of Hanover's (and subject to defenses applicable thereto) when Mr. Siclari's account was one in which *both* had an interest. That being the case, the Court does not believe that under the law as developed to date, or at least as presented to the Court, Mr. Siclari's account can be deemed to be an alter ego of Hanover's, or otherwise subject to defenses that are good only against Hanover.

To the (considerable) extent to which the use of Mr. Siclari's account (with his knowledge and ratification) as a "nominee," "straw man," or "front" account is otherwise relevant—as it plainly is with respect to Mr. Siclari's request for "customer claim" status and the Trustee's request for equitable subordination—the Court can and does take that use into account. But in this Court's view, consideration of the economic reality of the manner in which Mr. Siclari's account was used as a "nominee" account requires consideration of the considerable economic interest Mr. Siclari maintained in his account, and this disqualifies the account from being deemed to be an account owned by Hanover.

### Conclusion

For the foregoing reasons, the Court:

(1) overrules Mr. Siclari's objection to the Trustee's determination that Mr. Siclari's account should be denied "customer claim" status—with the result that Mr. Siclari's account will not receive the benefits of SIPA;

(2) will enter judgment granting the Trustee's request that Mr. Siclari's claims be equitably subordinated—with the result that Mr. Siclari's claims will be subordinate to customer claims and the claims of unsecured creditors; and

(3) sustains Mr. Siclari's objection to the Trustee's determination that Mr. Siclari's account should be deemed to be subject to defenses the Trustee has against Hanover, based on the Trustee's contention that Mr. Siclari was Hanover's "nominee"—with the result that his claims will not be wholly disallowed.

The Trustee will settle a judgment consistent with the foregoing on five business days' notice, by hand or fax, on counsel for Mr. Siclari. As always, the time to appeal from this determination will run from the time of entry of that judgment, and not from the time of this decision.